Petaccio, Appellant, *v.* New York Life Insurance Company.

Argued November 18, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Herman P. Abramson,* with him *Frank J. Marolla, Jr., Adrian Bonnelly* and *Louis Sherr,* for appellant.

*J. S. Conwell,* with him *Pepper, Bodine, Stokes &
Schoch* and *Louis H. Cooke,* for appellee.

OPINION BY CUNNINGHAM, J., January 29, 1937:

By stipulation of counsel the name of the plaintiff in
this action of assumpsit was amended, before trial, to
read "Dominick Petaccio." It was brought to recover
$15,148.17 as the proceeds of two contracts of life in-
surance which plaintiff alleged the defendant company
had issued in 1928 to his father, John Petaccio, and
in which plaintiff was named as the beneficiary.

The issuing of the policies described in the statement
of claim (full copies of which were attached), the
death of John Petaccio on July 14, 1933, and his rela-
tionship to plaintiff, were admitted by the defendant,
but it contested any liability under the policies in
excess of the amount of premiums it had received—
$1,995.72—upon the ground that in issuing them it had
not contracted with John Petaccio, but, through the
fraud and deception of plaintiff, had been induced to
contract with and insure the life of a middle-aged man
who was not plaintiff's father and whose real identity
was, even at the date of the trial, unknown to defendant.

In substance, the defense was that the man whose
death was proven was not the person who signed the
application for the insurance and presented himself
to, and was examined and passed by, defendant's medi-
cal examiner; that the agents and representatives of
defendant had been deceived into believing the appli-
cant for the insurance was plaintiff's father, John Pe-
taccio; but that in truth and in fact he was some other
person procured to assist plaintiff in the deception prac-
ticed upon defendant.

The trial before FINLETTER, P. J., resulted in a ver-
dict in favor of plaintiff for the amount of the premiums,
the return of which had been tendered by defendant.
Plaintiff moved for judgment in his favor for the face
of the policies, notwithstanding the verdict, or for a

new trial; a new trial was refused and the motion for judgment n. o. v. denied. This appeal by the plaintiff followed.

The first policy was issued in the sum of $5,000 on October 2, 1928, and had attached thereto a photostatic copy of an application, dated October 1st and bearing the signature, "John Petaccio", placed there in the presence of John A. Lavin, one of defendant's agents who signed as a witness. Upon the same sheet, and constituting Part II of the application, appeared the questions of and answers to defendant's medical examiner with respect to the condition of the alleged applicant's health, etc., which Part II also bore the signature, "John Petaccio," witnessed by Dr. Charles E. Cramp, defendant's medical examiner. By the terms of the policy the defendant agreed "to pay to Dominick Petaccio, son of the insured, ...... five thousand dollars upon receipt of due proof of the death of John Petaccio, the insured." One of the provisions read: "The policy and the application therefor, copy of which is attached hereto, constitute the entire contract." Another provision was, "This policy shall be incontestable after two years from its date of issue except for nonpayment of premiums ......"

The second policy was issued under date of October 11, 1928, in the sum of $10,000, and had attached thereto a separate photostatic copy of the application and answers to the medical examiner. The terms and provisions of the second policy were identical with those of the first, with the exception of dates and amounts and an amendment with relation to the manner of the payment of premiums.

The evidence indicates that the contracts of insurance sued upon had their inception under these circumstances. Dominick Petaccio, the beneficiary and appellant herein, was engaged in the florist business at No. 2964 Richmond Street, Philadelphia, where he

lived with his family. His father, Giovani (John) Petaccio, conducted a small grocery store and lived at No. 2716 East Somerset Street. George Clark, an insurance broker, testified that in the fall of 1928 he endeavored to sell Dominick Petaccio automobile insurance and was informed by him that Dominick's father "was interested in life insurance." Upon receipt of this information, Clark told Dominick he would bring around a friend who was a life insurance agent. Clark then saw John A. Lavin, a salesman for the defendant company to whom he was accustomed to refer life insurance prospects, and arranged to take him to Dominick's shop on Richmond Street. Lavin testified he went with Clark to the florist shop where they were introduced by Dominick to a man represented to be Dominick's father. The negotiations resulted in the preparation of an application to the New York Life Insurance Company for a $5,000 policy upon the life of the alleged father of Dominick, whose name was stated to them to be John Petaccio. In the application Dominick was named as beneficiary, the address of the proposed insured was given as No. 2964 Richmond Street, his occupation as florist, his place and date of birth Chieta, Italy, on November 4, 1882. When the application had been filled out the man to whom they had been introduced affixed the signature, "John Petaccio", thereto and Lavin signed as a witness. When Lavin turned the application into the office of the defendant in Philadelphia he suggested the preparation of an additional policy for $10,000. Clark testified he filled in the answers on Part I of the application and corroborated Lavin with respect to the circumstances under which that portion of the paper was signed.

Dr. Charles E. Cramp, defendant's medical examiner, testified that, following the receipt by defendant of Part I of the application, he examined a man giving the name of John Petaccio, at the Richmond Street florist

shop; filled out Part II of the application, which was signed in his presence by the person examined with the signature, "John Petaccio"; and that he signed that part of the paper as a witness and as medical examiner. The witness did not recall who introduced him to the person examined, saying, "All I knew [was] that I was told it was John Petaccio and he answered to that name." This witness testified that the person he examined was, as stated in the records made by the witness at that time, a clean-shaven man having a "ruddy complexion with light brown hair, brown eyes, ...... five feet four and a half inches" in height and weighing approximately 168 pounds.

The policies, when executed by defendant, were given to Lavin who, in explanation of the fact that two contracts were prepared, said: "Well, we simply went up there to sell insurance and we hadn't any thought of any amount at all, and we just sort of took a judgment on it, thought we might possibly place $15,000 there." The witness then testified he, in company with Clark, delivered both policies at the Richmond Street address to the person who signed the application. He stated he received the first premiums but did not recall whether they were paid by Dominick or the person represented to be his father.

During the period intervening between the issuing of the policies and the death of Giovani Petaccio the policies were once permitted to lapse by reason of nonpayment of premiums but were duly reinstated by defendant; at another time a comparatively small loan was made on each policy. In support of its contention that the person who signed the application was not Giovani Petaccio, the father of the beneficiary, the defendant introduced, inter alia, the testimony of Albert D. Osborn, a handwriting expert. At the time he was called to the stand there had been received in evidence eight genuine signatures of the appellant's father.

They had been signed upon an application for membership in the Philadelphia and Reading Relief Association, several notes given to a bank, and applications for policies of insurance in other companies; each read "Giovani Petaccio" and in none of them was the name "John" used. These signatures, referred to in the testimony as the "genuine signatures", were made during the period between June 1927 and March 1932. In addition to the two signatures, "John Petaccio", to which we have already referred as appearing upon the application and the medical examination, there were placed in evidence eight other signatures, reading "John Petaccio" and made in connection with the reinstatement of the policies and the granting of the loans above mentioned; these signatures became the "disputed signatures" in this case.

The witness testified that in his judgment "none of the signatures presented to the New York Life are the signatures of Giovani Petaccio." With the genuine signatures of appellant's father before him, together with the signatures reading "John Petaccio" and affixed to the application and other papers presented to the defendant, the witness said: "I have carefully examined these signatures Giovani Petaccio appearing on the Reading Railroad papers, the two Rzepski notes, the application to the Eureka Maryland Insurance Company, the applications to the Prudential Company and four applications to the Metropolitan. Comparing these signatures with the name John Petaccio appearing on the New York Life papers, in my judgment there is such a difference that I do not believe the same man wrote both sets of names." In brief, the testimony of the witness was that the genuine signatures of appellant's father were so poorly written, as compared with the signatures, "John Petaccio", upon the application and other papers in evidence which were well written, that in his opinion the appellant's father could not

have written the signatures appearing upon the application upon which the policies were issued.

In addition to this opinion evidence, the defendant introduced testimony tending to show that the person examined by defendant's medical examiner was not appellant's father. As stated, Dr. Cramp testified the man he examined had a ruddy complexion, with light brown hair and brown eyes and did not wear a mustache. There was evidence that in 1930 another application signed "John Petaccio" was made to defendant for an additional $10,000 policy, but was declined. George Zimmerman, an employee of the defendant, testified he made an investigation in connection with this application, in the course of which he went to the florist shop on Richmond Street and inquired for John Petaccio and was told by Dominick Petaccio that his father was in New Jersey. The witness stated that after some inquiries in the neighborhood he went to the address at No. 2716 Somerset Street, entered the grocery store, and inquired of an elderly woman in charge for John Petaccio; that a man who said he was John Petaccio presented himself and that this man was approximately five feet six inches in height and weighed about 155 pounds, had a dark complexion, black hair mixed with gray, and a heavy dark mustache. The witness said he attempted to talk with him about the application but was told in broken English by the man to whom he was talking that he knew nothing about it, and that Mrs. Petaccio, who was present, said to the witness, "You don't need to pay any attention to what he says because this insurance is being taken out and Dominick will pay for it."

Theodore D. Stinner, a representative of the Knights Life Insurance Company, testified his company had issued a policy upon the life of Giovani Petaccio and that upon notice of the death of the insured he went to his residence on East Somerset Street to have proofs of death prepared; that he there viewed Giovani Petac-

cio's body and recalled he "had dark hair, very gray at the temples," but could not remember definitely whether he had a mustache.

In rebuttal, the plaintiff called Leo F. Rzepski, the teller in the bank at which Giovani Petaccio transacted some business. This witness identified the signatures of Giovani Petaccio to several notes and stated he sometimes signed his first name as John and at other times as Giovani, but added that he occasionally "wished to sign with a cross and we would have to force him to write." The witness expressed the opinion that the disputed signatures "could be a signature of his as John Petaccio." Dominick Petaccio, in endeavoring to support his claim, testified his father signed many times with a cross but could write equally well with either hand, and when writing with his left hand did not "slant the letters differently from the way he did with the right hand."

There was also testimony that during the five year period involved in this case life insurance policies, aggregating about $45,000, in which Giovani Petaccio was named as the insured, were issued by a number of insurance companies, some of them requiring a medical examination. We have not attempted to review all the testimony but have called attention to its outstanding features.

The learned trial judge, after stating to the jury that in contracts of insurance the person who applies for insurance on his life is the person with whom the insurance company contracts and is the person who has a right to name the beneficiary, submitted two questions of fact to the jury: (1) Whether appellant's father contracted for this insurance, and whether there was any deception about the formation of the contract, and (2) Whether the defendant's doctor examined appellant's father or some other person fraudulently substituted for the purpose of undergoing the medical examination.

After directing the attention of the jury to the signatures admitted in evidence and referred to by the expert in his testimony, the trial judge continued: "Look at these papers, look at these pictures of these signatures. They are extremely important testimony, and then make up your minds about it. I will not point out to you the differences. That has been done by a qualified expert, and your own eyes can pick out the similarities and the differences and your own judgments can draw the proper conclusions from those similarities and those differences. In addition to the signatures themselves, a handwriting expert has been called, and the law permits the use of the skill of other people in numerous branches of science, medicine, engineering, real estate, and so on. You can not be an expert in every branch of knowledge, and therefore the law permits experts to give their opinion, and therefore the law permits the opinion of an expert in handwriting to be taken in a case like this. Of course, the opinion of a man who has given his lifetime to the study of a subject, while it is only opinion testimony and standing alone would amount to nothing, with the other facts of the case may be extremely valuable, and that expert witness in this case gave as his opinion that the man who wrote the signature in the form Giovani here did not write the signature to the paper that makes this policy a binding contract. You will consider that with the other testimony in the case."

No exception was taken to the general charge. The assignments, seventeen in number, relate to the refusal of a number of appellant's points for charge, the overruling of appellant's objection to the admission of certain testimony, the refusal of a new trial and of appellant's motion for judgment upon the whole record for the face of the policies, and the entry of judgment upon the verdict.

The eighteenth point submitted by appellant read:

"Your verdict must be for the plaintiff as to the $10,000 policy even though you believe it and even though you believe John Petaccio did not sign the application attached to the said policy of $10,000 if you find that the defendant company did not request an application and the medical examination for that policy of $10,000." The refusal of this point is the basis of the twelfth assignment and raises the first question discussed in the briefs.

It is important that the facts relating to the matter be clearly understood. It is true that but one application blank was filled up and signed. Attached to the statement of claim as Exhibit "A" was a photostatic copy of the five thousand dollar policy, dated October 2, 1928, and numbered 10,390,301, together with a photostatic copy of the application, dated October 1st, and consisting of two parts—Part I being the formal application for insurance to the amount of $5,000 and Part II containing the answers to the medical examiner. Each part bore the signature, "John Petaccio", and the numbers, 10,390,301 and 10,390,302. Paragraph No. 9 of part I was headed "Additions or Amendments (For Home Office use only)." By subdivision 3 of this paragraph it was "mutually agreed," inter alia, "That by receiving and accepting said policy, any additions or amendments hereto which the company may make and refer to in Question 9 above entitled "Additions or Amendments' are hereby ratified."

The "addition or amendment" made by the company, pursuant to this agreement, under paragraph 9 was: "(2) $10,000 Additional, written on the Ordinary Life plan. (20) Written with premiums payable semi-annually."

Also attached to the statement of claim as Exhibit "B" was a photostatic copy of the ten thousand dollar policy, dated October 11, 1928, and numbered 10,390,302. Forming a part of this exhibit was a photostatic copy of

the above described application, dated October 1st and bearing the numbers 10,390,301 and 10,390,302.

Appellant's point seems to be predicated upon the proposition that in so far as the ten thousand dollar policy is concerned the application was improperly received in evidence, and that the jury should have been instructed that their verdict must be for appellant as to the face of that policy. His counsel cite and rely upon Section 318 of the Act of May 17, 1921, P. L. 682, 40 PS § 441, and the case of *Fidelity T. & T. Co. et al v. Metropolitan Life Ins. Co.*, 305 Pa. 296, 157 A. 614.

The provisions of the act to which they direct attention are, in substance, that no application shall be received in evidence or be considered a part of the contract unless a correct copy of such application has been attached to the policy. They argue that because the defendant did not attach a separate and additional application, dated subsequent to October 1st and specifically applying for the ten thousand dollar policy, it could not defend as to that policy upon the ground that it did not contract with Giovani Petaccio for it.

The facts in the case of *Fidelity T. & T. Co. v. Met. Life Ins. Co.*, supra, were materially different from those here present. In that case the insured made a written application for a policy of $5,000, payable to his wife as beneficiary, and the agent of the defendant company, without any further authority, directed the company to issue an additional policy for $10,000, payable to the insured's wife and daughter. Subsequently, the agent procured the insured's oral consent to accept the $10,000 policy, which was the one involved in the litigation. Although the defendant company prepared and instructed its agent to have the insured execute certain "amendment forms," authorizing the $10,000 policy to be issued in reliance upon the written application for the $5,000 policy, they never were exhibited to or signed by the insured. The defense in that case

was that the insured had made false statements in the application for the $5,000 policy. It was held that the written application for the $5,000 policy, containing the alleged false statements, formed no part of the policy upon which suit was brought.

Here, the amendment to the effect that the application dated October 1, 1928, should also be considered as an application for an additional $10,000 policy was, in the manner above stated, endorsed upon the original application and ratified by the applicant.

The case at bar is ruled, we think, by *Stein v. New York Life Ins. Co.*, 311 Pa. 210, 166 A. 763. There, the insured made application, in writing, for a policy of $4,000, and it was alleged that certain representations therein contained were false. The policy was tendered to her but she refused to accept it. Subsequently she agreed to take a policy for $2,000, which was delivered to her and the premiums thereon paid until her death. To this policy was attached a copy of the application she had signed for the $4,000 policy. It had been changed by the company by adding to it, under the heading "Additions or Amendments (For Home Office use only)" the words "Sum insured $2,000. Insurance takes effect as of the fifteenth day of January, 1930, instead of as requested in the application." Apparently the form of the application used in the case cited was identical with the form here used and it was held that by accepting the policy and paying the premiums the insured ratified the amendment, with the effect that the company was entitled to show, if it could, that the representations made in the application, as amended, were false.

Under the authority of the Stein case the defendant was entitled to have the present application considered by the court and jury as the foundation and a constituent part of each contract. The point was properly refused.

The refusal of appellant's sixteenth point is complained of in his tenth assignment. It read: "The insurance company has admitted that it issued the two policies of insurance and that two years elapsed from the date of their issue. The insurance company is therefore barred from contesting the policies on its ground that John Petaccio did not sign the application."

This point was properly refused under the decision of our Supreme Court in *Ludwinska v. John Hancock Mut. Life Ins. Co.*, 317 Pa. 577, 178 A. 28, and cases there cited. That case involved a mother and two daughters, Bertha and Victoria. Bertha signed the name of her imbecile sister, Victoria, to an application for life insurance and was examined and passed by the defendant's medical examiner. Victoria was named as the insured, and the mother as the beneficiary, in the policy which contained a two year incontestability clause. Upon the death of Victoria more than two years after the policy had issued, suit was brought by the mother upon the policy as a contract made with Victoria. It was held there had never been any contract between the company and Victoria upon which the incontestability clause could operate.

There was no suggestion in the case at bar that Giovani Petaccio had authorized any person to sign the application for him; the contention of the appellant was that his father signed it himself.

By the fifth and sixth assignments it is charged the trial judge erred in refusing appellant's tenth and twelfth points. In them he was asked to say: "Testimony that the insurance company entered into a loan agreement, gave a loan on the policies, made a loan endorsement on the policies, paid dividends on the policies, reinstated the policy after lapsing and had the policies in its possession after [they] had been delivered to John Petaccio is evidence of waiver by the insurance company of its defense ...... and is

evidence to support a binding contract between the parties."

The argument for appellant upon this point is that even if it be assumed that Giovani Petaccio did not sign the application the defendant by accepting premiums, reinstating the policies, and making loans thereon waived the irregularity and ratified the contracts. In dealing with this subject, the trial judge instructed the jury that irregularities may, as a matter of law, be waived and invalid contracts ratified, but said "there are no facts" supporting appellant's contention to that effect in this case. Our examination of the record convinces us of the accuracy of this statement. Clearly, there could be no ratification unless the defendant knew or should have known prior to Giovani Petaccio's death that he had neither signed the application nor been examined by defendant's medical examiner.

Although the handwriting expert could not say that all of the signatures reading "John Petaccio" which were presented to defendant in connection with the reinstatement of the contracts and the granting of the loans were written by the same hand, an inspection of the exhibits demonstrates that there was no such dissimilarity between any of them as should have put defendant upon notice or inquiry. We agree with the following excerpt from that portion of the general charge in which the trial judge was dealing with appellant's contention for ratification:

"There is no such law as that. You can not ratify a fraud like that, especially where you do not know where you are in the case of the fraud committed against you. It would be ridiculous to say a man could be trapped into a fraudulent contract and then, assuming it to be genuine, would deal with it in a normal way, and then be told he has ratified the original fraud. A person can not be accused of ratifying a non-existent or fraudulent contract unless it is shown that he knew

of the fraud and went into the contract with his eyes open, knowing that he had been cheated as far as the original contract was concerned."

Another complaint by appellant is that there was insufficient evidence to sustain a finding that the application was not signed by his father. His counsel argue in their brief "that the opinion of the handwriting expert standing alone would not support a verdict that the insured did not sign the application." We have already quoted the portion of the charge in which the trial judge instructed the jury with relation to the manner in which they should deal with the signature exhibits, and in which he expressly stated that the testimony of the expert "standing alone would amount to nothing," but, when considered in connection with the other facts of the case, might be valuable.

One of appellant's points read: "Very little, if any, reliance ought to be placed on the testimony of the insurance company's handwriting expert." The court answered the point by saying the subject had been covered in the general charge. The excerpt, to which we have referred, shows that the jury was fully and correctly instructed as to the manner in which it should consider the expert's testimony. This contention on behalf of appellant ignores other testimony, which, if believed, would support a finding that the man who signed the application and was examined by Dr. Cramp and who was represented by appellant to be his father, was a smooth-shaven, fair-haired man with a ruddy complexion, whereas appellant's father had, on the contrary, a dark complexion, dark hair mixed with gray, and a heavy dark mustache.

We have examined all the assignments relating to the admission of evidence and are satisfied no substantial trial error was committed. As the trial involved the investigation of charges of fraud, deception, imposition and substitution in procuring the contracts and attempting to collect their fruits by proving the

death of a person whose life had not been insured, the trial judge was entirely justified in permitting a wide latitude upon both sides in the introduction of testimony. This case turned upon questions of fact. The jury was fully, clearly, and accurately instructed with reference to the application of the law to the facts as they might find them. We are satisfied, upon an examination of the entire record, there was sufficient competent and convincing evidence to support the verdict. Appellant's motions for judgment in his favor for the amount of the policies, or a new trial, were therefore properly denied.

Judgment affirmed.