**UNITY MUTUAL LIFE INSURANCE CO.**

v.

**Susan S. MOSES, Ind. & as Executrix of the Estate of Stephen D. Moses and Continental Bank.**

**Civ. A. No. 83–5905.**

United States District Court, E.D. Pennsylvania.

March 20, 1985.

Stephen S. Phillips, Philadelphia, Pa., for plaintiff.

Eugene M. Schloss, Elkins Park, Pa., for defendant—Susan S. Moses.

Victor A. Young, Philadelphia, Pa., for defendant—Continental Bank.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

The parties to this action have filed cross-motions for summary judgment. The facts pertinent to this matter have been stipulated to by the parties. The plaintiff, Unity Mutual Life Insurance Company, is a New York corporation. Susan Moses is a citizen and resident of Pennsylvania. Continental Bank is a Pennsylvania corporation. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

Unity Mutual is seeking to rescind a life insurance policy that Dr. Stephen Moses, the late husband of defendant Susan Mo-ses, had purchased approximately two years before his death in 1982. Dr. Moses had assigned the proceeds of the policy to Continental Bank. Pennsylvania law will be applied when necessary.

FACTS

In November, 1979, Dr. Stephen Moses was diagnosed as having a metastatic malignant melanoma, an often fatal form of skin cancer, which would later claim his life. Although inflicted with this deadly disease, the doctor continued to perform his normal work routine. In addition to building a private practice, the doctor worked part-time for a small community health center ("health center") located in Philadelphia. Approximately three months after he was diagnosed as suffering from cancer, Dr. Moses and his wife Susan decided to purchase the health center. As part of securing financial backing for this deal, Continental Bank required that the doctor purchase at least an additional $100,000 worth of life insurance over and above what he was carrying at that time.[1] The doctor contacted a local insurance broker, whom he had conducted business with previously, and purchased the necessary insurance.[2] This transaction occurred in April, 1980, approximately a month and a half after the purchase of the health center.

As with all underwritten life insurance policies, the doctor was required to answer a number of questions on the current status of his health. The answers are used to determine if the applicant is an acceptable risk for coverage. The information the doctor provided the insurance company was less than truthful in that he stated that he was in good health, that at his last yearly check-up he was "within normal limits" and he specifically denied ever having consulted a physician for cancer. The application also requested that the insured provide the name and address of his personal physician, ostensibly for the purpose of corroborating the medical history of the applicant.

---

1. The additional insurance policy was to cover the mortgage that secured the health center.

2. The insurance broker was without knowledge of the condition of the doctor.

The doctor listed his personal physician as Doctor James Lewis and gave the health center he had recently purchased as Dr. Lewis' address. It is admitted by all parties that Dr. Lewis was not Dr. Moses' personal physician nor had he ever examined him. Dr. Lewis had been employed at the health center but prior to the Moses' purchase of it, he had ceased working there and relocated his practice elsewhere.

Upon receipt of the insured's application, Unity Mutual sent a medical questionnaire, commonly referred to as an Attending Physician's Statement ("APS"), to Dr. Lewis at the health center's address. The purpose of the APS was to confirm the medical history as furnished by Dr. Moses. The APS that was returned to Unity Mutual represented that Dr. Moses was seen for routine matters and that his present health condition was excellent. The statement was dated May 10, 1980 and carried a signature purporting to be that of Dr. Lewis. In fact, Dr. Lewis did not sign the APS nor does he have knowledge of who it was that signed his name. On December 23, 1980 Dr. Moses assigned the benefits of his life insurance policy to Continental Bank. On September 1, 1982, more than two years after the effective date of the life insurance policy, the doctor succumbed to cancer. Continental Bank, as beneficiary, supplied Unity Mutual with the necessary papers for processing the claim. The death certificate listed the cause of death as metastatic malignant melanoma. Due to the nature of the death and the lack of any information indicating such a condition existed, Unity Mutual began an investigation into the circumstances under which the policy was issued. As part of the investigation a handwriting expert was hired to compare the signature of Dr. Moses along with that contained on the APS. This expert concluded that the signature of Dr. Lewis was that of Dr. Moses. At that point further information was obtained by Unity Mutual and the true condition of the doctor in 1980 became known. The insurance

company then filed suit seeking to rescind the life insurance policy.

If this was a case where the court was asked to decide whether fraud was committed our task would be straight forward and simple, for it is well settled that fraud taints with illegality and invalidity anything its evil shadow darkens. *Iacoponi v. Plisko*, 412 Pa. 576, 195 A.2d 362, 365 (1963). But this is not such a case, for Pennsylvania, like most other states, has passed a law which mandates that any life insurance policy delivered in the Commonwealth contain a provision that the policy shall be incontestable after it has been in force two years from its date of issuance. 40 Pa.C.S.A. § 510(c). The policy in question satisfies the two year time requirement.[3]

In accordance with the Pennsylvania statute the policy delivered to Dr. Moses contained the following clause:

This policy shall be incontestable after it has been in force during the lifetime of the insured for two years from its effective date except for nonpayment of premiums and except as to any provision for disability or accidental death benefits.

The plaintiff believes that the manner in which this fraud was perpetrated allows them to void the insurance contract in spite of the clear wording of the incontestability clause. The defendants counter that the provision is absolute in its terms and that the plaintiff may not, as a matter of law, contest the validity of the life insurance policy.

DISCUSSION

Historically, the incontestability clause was an early insurance company response to the well-founded public perception that the life insurance contract could be voided, almost at will, by the insurer's discovery of the slightest discrepancy on the policy application. The typical situation involved an insured who made a material misrepresentation about his health. If this fraud or

**3.** The policy was issued on April 11, 1980. Dr. Moses died approximately two (2) years and five (5) months later on September 1, 1982.

misrepresentation was discovered subsequent to the insured's death, the insurer could resist payment of the claim since fraud is a complete defense to the formulation of the contract. Since the insurer was not barred by the passage of time in asserting this defense, a tremendous burden was placed on the aggrieved beneficiary since the alleged misrepresentation may have occurred many years before and evidence which may have been favorable to the claim might only be known by the deceased.

This situation gave rise to a wide spread public belief that the contract was skewed in favor of the insurance company and that the protection intended for the beneficiaries was illusory. Many insurance companies responded to this by incorporating an incontestability clause into the life insurance policy. In Pennsylvania, the state legislature in 1921, formalized the practice by passing into law a two year incontestability limitation.

One effect of an incontestability clause is to permit recovery in cases where an insured purposely commits fraud. Balanced against this undesirable result, however, is the social desirability of assuring a beneficiary that the proceeds of the policy would not be challenged at some remote point in time when the insured was dead and those who may testify in his favor are deceased or otherwise unknown or unable.

The effect of this clause is to provide a two year period in which the company may ascertain whether the insured has perpetrated any type of fraud in obtaining the coverage. If the company cannot detect any falsity or fraud, then they are obligated to make no further inquiry and assert no defenses on the claim. *Central Trust Company v. Fidelity Mutual Life Insurance Co.*, 45 Pa.Super. 313, 314, 315 (1911).

Pennsylvania tribunals have long interpreted the meaning of the incontestability clause to be absolute. In *Feierman v. Eureka Life Insurance Company*, 279 Pa. 507, 124 A. 171 (1924) the Pennsylvania Supreme Court stated that "the clause means precisely what its language states:

the policy will not be challenged, opposed or litigated, and is indisputable after two years." *Id.* at 509, 124 A. 171.

If the fraud or material misrepresentation is not uncovered within two years from the policy effective date, the life insurance contract will be held to be valid and binding on the insurance company. *Brady v. Prudential Insurance Co.*, 168 Pa. 645, 32 A. 102 (1895); *Lawler v. Home Life Insurance Company of America*, 59 Pa.Super. 409 (1915); *Feierman v. Eureka Life Insurance Co., supra; Gorski v. Metropolitan Life Ins. Co.*, 88 Pa.Super. 326 (1926).

Pennsylvania courts have recognized only one exception to the incontestability defense, and that is where the insurance company can prove that an imposter was used to deceive the insurance company into issuing the policy. This exception was first reported in the case of *Ludwinska v. John Hancock Mutual Life Insurance Company*, 317 Pa. 577, 178 A. 28 (1935). Victoria Ludwinska was an infirm adolescent who had been committed to an asylum. Her sister Bertha applied for a life insurance policy and represented herself as Victoria, signing the application in that capacity. As a precondition to placing the policy in force, a medical exam was required of the applicant. Bertha, posing as Victoria, submitted to the physical examination. The policy contained a two year incontestability clause and Victoria died more than two years after the policy was issued. The insurance company discovered the fraud and sought to rescind the policy. The beneficiary asserted that the insurer was estopped from contesting the validity of the policy due to the incontestability provision. The *Ludwinska* court held that where one contracts with an individual face to face and intends the contract to be operational to that person, regardless of the name she has adopted, then the contract applies to those parties only. No contract existed because the essential condition that the minds of the parties must agree to the particulars had never occurred. When a life insurance policy is procured by impersonating the party to be insured, no con-

tract will exist and thus the incontestability clause is inapplicable. *Id.*, 178 A. at 30.

The *Ludwinska* decision was followed by the court in *Petaccio v. N.Y. Life Ins. Co.*, 125 Pa.Super. 15, 189 A. 697 (1939). That case involved a situation in which a son substituted an imposter for his father to take a medical examination required by New York Life Insurance Co. The imposter signed the application and presented himself for a physical examination. The court held that since the contract was between the insurance company and a person other than the named insured, no contract was ever formed and the incontestability clause was not applicable. *Id.* at 28, 189 A. 697.

Plaintiff believes that the unique nature of this fraud is akin to the legal principals which voided *ab initio* the life insurance policies in *Ludwinska* and *Petaccio*. Dr. Moses not only committed fraud in his initial application for insurance, but he continued his fraudulent scheme by circumventing the reasonable investigatory measures the insurance company undertook to verify the truthfulness of his statements. His fraud was designed to thwart the inquiry necessary to uncover the truth, as such there was never any meeting of the minds. As with the factual situation in *Petaccio* and *Ludwinska*, the policy could not have been issued but for Dr. Moses' impersonation of Dr. Lewis. I agree with this characterization and wish to add these additional observations. Fraud is an abhorrent act. The judiciary should work to eradicate the unfavorable effects that frauds wreak on society at large. My research, which examined all the jurisdictions of the United States, has not uncovered even one reported case similar in nature to the facts as represented here. The normal business practice of a life insurance company is designed to uncover false statements made on an application. Simply by corresponding to the doctor of record and receiving a signed report verifying the truth of his patient's health can reliable information be obtained. It's a simple yet effective means, available without distinction to the financial resources that a company has, to ascertain the truth. Both the largest and the smallest companies employ this method with, undoubtedly, great success. Yet, normal business practices would not suffice to uncover the fraud committed here.

The legislative enactment of the incontestability clause did not eliminate the basic proposition that underlies it, namely, that insurance companies would not be injured by the clause since they possess the means, through normal business practices, to uncover fraud in an application. Nothing I can imagine is more basic and trustworthy than a signed statement from a treating physician as to the health of his or her patient. The signed statement, which included the proper medical terms, would not raise the suspicion of any underwriter who reviewed it. Even the most ardent skeptic would believe the truth of a signed statement from a doctor knowing that the letter was mailed to the doctor and not transmitted by the applicant as an intermediary; the letter was addressed to a community hospital; it was promptly returned and signed. I cannot in good conscience say that a company which goes to such a thorough extent to verify the truth only to find itself fooled by the grand illusion of the one person who possessed the knowledge, skills and opportunity to orchestrate this charade, should be the party penalized.

Dr. Moses committed more than simple fraud, he also undertook a criminal act of intercepting mail which was earmarked for another person. This fraudulent act was a cold calculation to circumvent a system that contained reasonable and workable safeguards to verify his health condition.

The insurer should not be put in the position where not only must they examine the truth of the application, but also the truth of the physicians' statements. There is no method short of hiring a private detective to delve into the entire history of the life insurance applicant that could be more effective in uncovering lies. The law does not require absurdity to displace common sense. Both the *Ludwinska* and *Petaccio* decisions share in common with these facts the important and practical con-

cept that the type of fraud that was committed was simply not capable of detection absent extraordinary measures. Normal business practices would not uncover an artful substitution of a treating physician at a verification examination.

The eloquence of Justice Musmanno is worthwhile repeating, "fraud taints with illegality and invalidity anything its evil shadow darkens." *Iacopani v. Pliska, supra.* The insurance carrier's bright light in search of truth was not powerful enough to penetrate the dark shadows cast by this fraudulent and criminal act. This court will not uphold such an abhorrent scheme merely because the insurance industry practice failed to uncover the truth prior to Dr. Moses' death. The truth was not discovered in the *Ludwinska* and *Petaccio* cases until after the death, yet the policies were rescinded. The scheme Dr. Moses developed was devious and unique in that he, and he alone, possessed the ability to continue the fraud at each stage without further assistance of any party.

I find that the protection of the incontestability clause does not extend to a wrongdoer who thwarts the investigation into the truth of his statements by posing as the independent verifier of the accuracy of the applicant's health. I will grant plaintiff's summary judgment motion and enter final judgment in their favor.