William J. BROSNAN, M.D. Plaintiff,

v.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,
Defendant.

No. CIV.A. 96–4605.

United States District Court,
E.D. Pennsylvania.

Dec. 17, 1998.

---

John Rogers Carroll, M. Patricia Carroll, Philadelphia, PA, for Plaintiff.

Peter J. Hoffman, Amy L. Currier, Philadelphia, PA, for Defendant.

## MEMORANDUM

REED, District Judge.

Presently before the Court is the motion of Provident Life and Accident Insurance Company ("Provident") for summary judgment (Document No. 15) and the response of plaintiff William J. Brosnan, M.D. ("Brosnan") thereto. At issue is whether Brosnan is totally disabled as defined in two disability income protection policies issued by Provident and, therefore, entitled to receive disability benefits. For the reasons stated below, the motion will be denied.[1]

## I. BACKGROUND

The following facts are based on the evidence of record viewed in the light most favorable to plaintiff William Brosnan, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 865 (3d Cir.1997).

Brosnan was a practicing anesthesiologist until August of 1992, when he was terminated by Darby Anesthesia Associates, a practice group with which he was associated, after alcohol was detected on his breath. Reportedly, he had been warned previously that someone had smelled alcohol on his breath. Shortly thereafter Brosnan was admitted to the Strecker Program for treatment of addictions at the Institute of Pennsylvania Hospital. At Strecker, Brosnan was treated, and continues to be treated, by Richard F. Limoges, M.D., a psychiatrist whose discharge diagnosis from the hospitalization included: alcoholism, chronic dysthymia, acute depressive episodes, and mild organic brain syndrome. Following his discharge from the hospital, Brosnan withdrew from the practice of anesthesiology and made a claim under two disability income policies and Provident began to pay benefits to Brosnan.[2]

In September of 1993, Dr. Limoges, responding to questions posed by a Provident claims manager, declared that he considered Brosnan to be disabled from his specialty of anesthesiology because of the discomfort and distress which Brosnan experienced when he thought about reentering the operating room to administer anesthesia. (Plaintiff's Answer to Defendant's Motion for Summary Judgment ("Plt.Ans."), Exh. A). Dr. Limoges described Brosnan as experiencing "panic" and suffering from a "severe anxiety reaction." (*Id.*). Dr. Limoges also noted a degree of performance diminution and deterioration of abilities. (*Id.*)

Approximately two years later, in mid–1995, Brosnan was examined by Robert M. Toborowsky, M.D., a psychiatrist retained by Provident to evaluate Brosnan's claim of disability. In his report, Dr. Toborowsky opined that Brosnan's "decision not to return to the practice of anesthesiology should be deemed a voluntary one and not based on any underlying psychiatric disability." (Def.Mem., Exh. C). In a letter dated September 25, 1995, Provident notified Brosnan that he was no longer eligible for disability benefits under the Provident policies. (Def.Mem., Exh. D).

---

1. The Court notes that jurisdiction is proper pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive interest and costs. Also, it is undisputed that Pennsylvania law applies.

2. The disability income protection coverage policies are identified by number. Policy No. 6–334–697727 was issued on February 5, 1986 (Memorandum of Law in Support of the Motion for Summary Judgment of Defendant ("Def.Mem."), Exh. A), and Policy No. 6–335–749086 was issued on October 25, 1986 (Def.Mem., Exh. B).

In response, Dr. Limoges submitted a report to Provident disputing Dr. Toborowsky's characterization of Brosnan's attitude about the operating room as a voluntary choice and not based on any underlying psychiatric disability. (Plt. Ans., Exh B). Dr. Limoges based his rebuttal upon his records, upon Dr. Toborowsky's letter, upon his continued clinical observations of Brosnan and upon weekly group therapy sessions and monthly individual therapy sessions. Dr. Limoges opined that Brosnan was at risk if he reentered the operating room for the following reasons: "a relapse of alcoholism if the anxiety of entering the operating room is too great; resumption of Benzodiazepines or other anti-anxiety agents in an abusive fashion; or the use of psychoactive chemicals which are plentiful and abundant in the operating room and which are often associated with chemical dependency in their own right." (Plt.Ans., Exh. B). Dr. Limoges concluded that "Dr. Brosnan is disabled by virtue of his conditions of alcoholism, anxiety and depression, and is at this time unable to reenter the operating room to perform his duties as an anesthesiologist." (Plt.Ans.Exh. B). In a 1997 supplementary report, Dr. Limoges summarized his diagnosis and conclusions as follows: "Dr. Brosnan continues to suffer from Chronic Depression and Dysthymia along with persistent Anxiety.... He suffers from Anxiety, Chronic Alcoholism in Remission and testing shows Chronic Brain Dysfunction especially with regard to performance abilities which are critical in a fast moving operating room. My further conclusion, also to a reasonable degree of medical certainty, is that Dr. Brosnan should not return to the operating room as an Anesthesiologist .... This is due to both his persistent chronic anxiety as well as his decreased performance functioning independently." (Plt.Ans., Exh. F).

Brosnan was also evaluated in March of 1997 by Victor J. Malatesta, Ph.D., a clinical psychologist. Dr. Malatesta conducted a battery of tests calculated to evaluate Brosnan's cognitive and neuropsychological functioning. In his report, Dr. Malatesta found consistent and reliable evidence of chronic brain dysfunction. (Plt.Ans., Exh. D). Dr. Malatesta notes a 23–point difference between the verbal and nonverbal scores and that this "is consistent with some disruption in cortical brain functioning." (Id.). Dr. Malatesta also observed "significant deficits in the area of perceptual organization and visuospatial processing." (Id.). With regard to perceptual motor functioning, Dr. Malatesta found that "tests of visuospatial speed, visual scanning and rapid visual motor coding revealed mild to moderate impairment." (Id.). Dr. Malatesta also found that "on a complex nonvisual task requiring tactile and kinesthetic senses, memory, and upper extremity coordination and speed, Dr. Brosnan performed overall in the moderate impairment range." (Id.). Dr. Malatesta noted further that "his performance on the second and third trials was moderately to severely impaired." (Id.). Overall, Dr. Malatesta found that the pattern of deficits was consistent with the chronic effects of long-term alcohol dependence but found no evidence to suggest that the deficits are part of a progressive disorder. (Id.). Dr. Malatesta also found "no evidence of symptom exaggeration of malingering. In fact, his tendency is to minimize, deny and avoid his difficulties." (Id.) Based upon the neuropsychological test findings, Dr. Malatesta concluded that "there is no reasonable way that Dr. Brosnan could return to his previous work as an anesthesiologist. In fact, without the use of compensatory strategies, he may be expected to experience difficulty in his current family practice work." (Id.).

Brosnan was examined in May of 1997 by Peter C. Badgio, Ph. D, a neuropsychologist. Although Dr. Badgio found Brosnan "demonstrates relative weakness on perceptual motor tasks, particularly speeded perceptual motor tasks," he ruled out any progressively deteriorating condition and opined that Brosnan's "current neuropsychological functioning remains as strong or better than it was at the time that he ended his work as an anesthesiologist." (Def.Mem., Exh. I). Dr. Badgio concluded that there is no neuropsychological evidence that Brosnan could not perform his professional activities at the same level as he did prior to 1992. (Id.).

Dr. Badgio's conclusions were, in turn, disputed by Dr. Malatesta. Among other things,

Dr. Malatesta notes that Dr. Badgio downplayed Brosnan's impaired performance across a range of "speeded perceptual motor tasks." (Plt.Ans., Exh. E). Although noting that Brosnan's peers could best evaluate his ability to function as an anesthesiologist, Dr. Malatesta notes that "time and speed of response are life and death issues in the operating room." (*Id.*). In addition, Dr. Malatesta opined that Dr. Badgio "sidestepped the issue of neuropsychological impairment and chronic brain dysfunction in his interpretation of Dr. Brosnan's test performance." (*Id.*) Dr. Malatesta, as an expert in behavioral therapies, also disputed that Brosnan was a suitable candidate for the type of symptom focused treatment suggested by Drs. Toborowsky and Badgio. (*Id.*). Finally, Dr. Malatesta took issue with Dr. Badgio's conclusion that Brosnan is no more disabled now than at the time he stopped working as an anesthesiologist. (*Id.*). Dr. Malatesta first notes that there is no way to determine what Brosnan's mental abilities were at the time he ceased working as an anesthesiologist. (*Id.*). Despite a documented tendency of Brosnan to minimize his difficulties, Drs. Badgio and Toborowsky relied on Brosnan's recollection that his performance as an anesthesiologist was unimpaired. (*Id.*). Dr. Malatesta then points out that testing "clearly showed that moderate diffuse brain impairment was present in 1992, and continues to be present in 1997. This level of impairment is typically associated with disability...." (*Id.*). Thus, Dr. Malatesta concluded: "The point, however, is that Dr. Brosnan was disabled in 1992, and current data continue to reflect this disability. Whether or not it is 'relative to his mental abilities at the time he stopped working as an anesthesiologist,' as noted by Dr. Badgio, is immaterial." (*Id.*).

## II. LEGAL STANDARD

Defendants have moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v.*

*Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).

## III. DISCUSSION

The present controversy centers whether Brosnan is totally disabled as defined in each of the two disability income insurance policies Brosnan purchased from Provident in 1986. (Def. Mem., Exhs. A & B). Under policy 3–334–697727:

> [t]otal disability is defined to mean that due to injuries or sickness:
>
> (1) you are not able to perform the substantial and material duties of your occupation; and
>
> (2) you are under the care and attendance of a Physician

(Def.Mem., Exh. A). Under policy 6–335–749086:

> [t]otal disability or totally disabled means that due to Injuries or Sickness:
>
> (1) you are not able to perform the substantial and material duties of your occupation; and
>
> (2) you are receiving care by a Physician which is appropriate for the condition causing the disability

(Def.Mem., Exh. B).

■ Provident first argues that Brosnan's occupation under the policies is that of a medical doctor, as opposed to an anesthesiologist, and, therefore, Brosnan is not totally disabled because he can and is presently working as general practitioner. Provident's

argument is disingenuous at best. Occupation, as defined by the policies, is the occupation regularly engaged in at the time the claimant becomes disabled. On his application for both policies, Brosnan made clear that his occupation was the "practice of anesthesiology." The uncontradicted evidence also shows that anesthesiology was the sole professional activity in which Brosnan was regularly engaged at the time he became disabled. *See DiTommaso v. Union Central Life Ins. Co.*, 1991 WL 124601 *3 (1991) (plaintiff was not disabled because he was still earning his primary living as osteopathic physician even though disability prevented him from performing surgery where surgery was "at most 15% of his practice").[3]

■ Next, Provident argues that Brosnan is not disabled because he suffers only from a speculative fear of relapse if he were to return to the operating room as opposed to a presently existing disability.[4] In support of its argument, Provident points out that Brosnan's condition has been diagnosed as "chronic," reasoning that there is no reason why Brosnan cannot perform at the same level as he did before he was fired. Provident also notes that Brosnan's recovery, by all accounts, has been successful. The gravamen of Provident's argument is that Brosnan has made a voluntary choice not to return to the practice of anesthesiology. Accordingly, Provident asserts that "plaintiff is not able to sustain his burden of proving that he is totally disabled as defined by the policies at issue." (Def. Mem. at 7–8).

It is, however, Provident that has failed to meets its burden of establishing the absence of any issue of material fact for purposes of its motion for summary judgment. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362–63 (3d Cir.1992) ("To raise a genuine issue of material fact, however, the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence."). The record contains sufficient evidence that a reasonable jury could find that Brosnan is totally disabled as defined in the policies. Brosnan has been diagnosed as suffering from chronic depression and dysthymia along with persistent anxiety. (Plt.Ans., Exh. F). In addition, Brosnan's treating physician concluded that he "suffers from Anxiety, Chronic Alcoholism in Remission and testing shows Chronic Brain Dysfunction especially with regard to performance abilities which are critical in a fast moving operating room." (*Id.*). Dr. Limoges further concluded that Brosnan is unable to return to the operating room "due to both his persistent chronic anxiety as well as his decreased performance functioning independently." (*Id.*). Thus, a reasonable juror could find that Brosnan's condition prevents him from performing substantial and material duties of an anaesthesiologist.

■ The fact that Brosnan suffers from the effects of chronic mental and brain dys-

---

3. Provident also argues that Brosnan does not meet the definition of totally disabled under one of the policies because he is not receiving appropriate care. Policy No. 6–335–749086 requires that the "claimant must be receiving care by a physician which is appropriate for the condition causing the disability." Provident asserts that Brosnan is not receiving appropriate care because he is not undergoing symptom focused therapy or taking medicine to control his anxiety. (Def.Mem., Exh. M). However, both Drs. Limoges and Malatesta refute this assertion. (Plt. Ans., Exhs. B, E & G). Thus, a reasonable juror could find that such treatment is inappropriate for Brosnan and that he is receiving appropriate treatment from Dr. Limoges.

4. Provident has also argued that Brosnan's fear of relapse if he returns to the operating room is simply a fear of a potential harm and, therefore, is not a compensable injury. *See Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (Pa.1996) (asymptomatic pleural thickening, i.e., unaccompanied by disabling consequences of physical impairment, is not a compensable injury). This case is distinguishable from *Simmons* because, at least in the minds of some experts, Brosnan suffers from some physiological impairments as well as emotional impairments. (Plt. Ans., Exhs. D & F). Thus, although the fear of relapse is one of the reasons for Brosnan's alleged disability, it is not the only one.

function impairments is not itself dispositive because it is not a requirement under the policy that the claimant's condition deteriorate over time. Indeed, as opined by Dr. Malatesta, it may be that in 1992, the effect of chronic alcohol abuse and anxiety became disabling such that Brosnan is entitle to benefits and that his condition persists such that he is "totally disabled" as defined by the policy.[5] (Plt.Ans., Exh. E). That, however, is a question to be determined by the finder of fact.[6]

Provident also argues that it is entitled to summary judgment on the issue of recision. Provident asserts that Brosnan made at least one, if not several, material misrepresentation on his applications for these policies in 1986. Each policy application form asked specific questions about Brosnan's past medical history. The application for Policy No. 6–334–697727 asked:

> 6. Have you ever been treated for or had any know indication of:
>
> (a) High blood pressure, diabetes, cancer, arthritis, asthma, emphysema, or emotional, nervous or mental disorder, or disease or disorder of the eyes, ears or speech?

(*Id.*, Exh. A). The application for Policy No. 6–335–749086 asked:

> 2. Have ever been treated for or had any known indication of:
>
> b. Dizziness, fainting, convulsions, headache; speech defect, paralysis or stroke; mental or nervous disorder?
>
> c. Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder?

> d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart of blood vessels?

(*Id.*, Exh. B.)

Brosnan answered "no" to each of these questions. His answer did not reflect the following: (1) Brosnan had been treated for mild hypertension since sometime in the early 1980's and was taking a prescribed medication for this condition at the time of the application; (2) Brosnan had an episode of shortness of breath in the late 1970s for which he was briefly hospitalized; (3) Brosnan stutters; and (4) in the early 1980s, after alcohol was detected on his breath at work, he was visited by people from the Medical Society who tried to interest him in attending a group for physicians with alcohol problems. Although Brosnan attended meetings on a few occasions, he did not think he had an alcohol related problem and did not attend further meetings. (Def. Mem. Exh. H at 31).

■ Under Pennsylvania law, an insurer must establish three elements to void an insurance policy on the grounds of false and fraudulent representations: (1) the declaration must be false; (2) its subject matter must be material to the risk; and (3) the applicant must have known it to be false or must have made the statement in bad faith. *Van Riper v. The Equitable Life Assurance Society of the United States*, 561 F.Supp. 26, 30 (E.D.Pa.1982). First, with respect to his alcoholism, Provident has provided no evidence that Brosnan made the statement in bad faith or knew it to be false.[7]

■ Second, and more importantly, both policies contain incontestability clauses which state:

---

5. Admittedly, the argument that Brosnan's anxieties and limitations are no different than they were prior to his being terminated in 1992 and, therefore, he is no less able to perform the duties of an anesthesiologist than he was prior to being terminated may be persuasive to a jury. The point is, however, that the extent to which the chronic nature of his mental and physical deficits effects his present condition is a factual determination.

6. It is the presence of a genuine issue of material fact precludes the granting of defendant's motion for summary judgment on the issue of total dis-

ability, not the merits of the case. The Court is not sanguine that the plaintiff will recover before a jury. But the Court's views in that regard are irrelevant because the Court may not determine the believability or weight of the evidence.

7. It is well documented that denial is a common symptom of alcoholism. There is no evidence that Brosnan was aware, prior to 1992, that he had a drinking problem. On the contrary, the record supports a conclusion that he did not believe he had a drinking problem. (Def. Mem., Exh. H at 31).

1. After this policy has been in force for two years during your lifetime, we cannot contest the statements in the application. 2. No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific description had existed before the Effective Date of this policy.

(Def. Mem., Exhs. A & B). There is no contention that Brosnan's disability was caused by any condition excluded by name or specific description or in the policy schedule. Moreover, at the time of Brosnan's disability, the policy was in effect for many years; long enough to trigger the incontestability clause.

Pennsylvania courts have long interpreted the meaning of the incontestability clause to be absolute. *Unity Mutual L.I.C. v. Moses,* 621 F.Supp. 13, 16 (E.D.Pa.1985). As far back as 1924, the Pennsylvania Supreme Court stated that "the clause means precisely what its language states: the policy will not be challenged, opposed or litigated, and is indisputable after two years." *Feierman v. Eureka Life Ins. Co.,* 279 Pa. 507, 124 A. 171, 171 (1924). The effect of an incontestability clause is to provide a two year period in which the insurance company may ascertain whether the insured has perpetrated any type of fraud in obtaining the coverage, after which it is obliged to make no further inquires nor challenge the validity of the policy. *Moses,* 621 F.Supp. at 16.

Provident nevertheless argues that the clause should not apply. *See Unity Mutual Life Insurance Co. v. Moses,* 621 F.Supp. 13, 16 (E.D.Pa.1985). Provident tries to draw support from *Moses* in which the applicant not only lied about having skin cancer but also fraudulently posed as his own doctor in making the medical certification. *Id.* at 17. The *Moses* Court, however, analogized the fraud perpetrated by the defendant to the one recognized exception to the incontestability defense, and that is where the insurance company can prove that an imposter was used to deceive the insurance company into issuing the policy. *Id.* ("Dr. Mosses committed more than simple fraud, he also undertook a criminal act of intercepting mail which

was earmarked for another person. This fraudulent act was a cold calculation to circumvent a system that contained reasonable and workable safeguards to verify his health condition."). There are no such facts here. To the extent that Brosnan knowingly made any material misrepresentations, the incontestability clause serves bar Provident from challenging the validity of the policy. *Groll v. Safeco Life Ins. Co.,* 388 Pa.Super. 556, 566 A.2d 269, 270 (Pa.Super.1989) (incontestability clause barred insurer from asserting insured's status as an ineligible employee as defense to nonpayment of death proceeds).

## IV. Conclusion

Based upon the foregoing analysis, I will deny the motion.