Michael HELLMAN, M.D.,

v.

UNION CENTRAL LIFE INSURANCE COMPANY.

No. 3:00–0537.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 10, 2001.

Watkins, McGugin, McNeilly & Rowan, PLLC, Nashville, TN, for plaintiff.

Bowen, Riley, Warnock & Jacobson, PLC, Nashville, TN, for defendant.

## *MEMORANDUM ORDER*

JOHN T. NIXON, Senior District Judge.

Plaintiff Michael Hellman sued Defendant, Union Central Life Insurance Company ("UCLI"), seeking damages for alleged breach of the insurance contract between the parties. (Doc. No. 1, Cmplt.) Pending before the Court are the parties cross-Motions for Summary Judgment, and accompanying memoranda. (Doc. Nos 17 and 18, Pl. S.J. Memoranda, and Doc. Nos. 22 and 23, Def. S.J. Memoranda.) Both parties have filed corresponding Responses (Doc. Nos. 28 and 30), and Replies (Doc. Nos. 35 and 36). For the reasons stated below, the Court DENIES Plaintiff's Motion for Summary Judgment, and it partially GRANTS but partially DENIES Defendant's cross-Motion for Summary Judgment.

### I. FACTS

Most of the facts herein described are undisputed, at least for purposes of each party's summary judgment motion. (Doc. Nos. 29, 33, and 34, Statements of Undisputed Material Facts ("Stmt.Undisp.Facts").) Plaintiff Michael Hellman, M.D., is a physician licensed to practice medicine in several states. From the time he was sixteen until he was forty-eight years old, Plaintiff used "mood altering chemicals ... on a daily basis." (Depo. Hellman at 77.) When Plaintiff was a teenager in the 1960's, both his parents and medical staff members at the hospital where he worked as an orderly told Plaintiff that he was an alcoholic and encouraged him to stop drinking. (*Id.* at 74–76.) Plaintiff acknowledges to have used many drugs such as marijuana, cocaine, amphetamines, barbiturates, and opium. (*Id.* at

76.) However, there is a dispute as to whether Plaintiff's friends while in medical school thought that his drug and alcohol usage reached the level of being "problematic." (Doc. No. 29, Resp. to Def. Stmt. Undisp. Facts at ¶ 11.)

During his medical internship and residency in anesthesiology in the early 1970's, Plaintiff continued to abuse alcohol and drugs, and began stealing anesthetic drugs from hospitals for his own personal use. This conduct continued through 1984. Plaintiff married in 1975, and during this period his wife frequently encouraged him to stop drinking. (Depo. Hellman at 100–01.) In the early 1980's, Plaintiff's substance use started to interfere with his employment. In 1984, the professional anesthesiologist group with which Plaintiff was associated asked him to leave the group. Although Plaintiff asserts that he was not given a reason, he admits that it was likely due to his drug dependency, which "affected everything [he] did [his] whole life." (*Id.* at 109.)

During this time, Plaintiff had applied for disability benefits, and was insured under UCLI Policy No. 040268H in 1983, and acquired additional insurance under Policy No. 052593H in 1986, with the disability monthly payments totaling $7,400.

His drug and alcohol abuse continued through Labor Day 1994, when Baptist Hospital "intervened on" Plaintiff after he falsified anesthetic records in diverting drugs to himself. At that time Plaintiff checked into the Talbot Marsh Rehabilitation Clinic in Atlanta, to be treated for his substance dependency. Plaintiff was released in 1995, for two years thereafter he strictly adhered to a "contract of recovery", and has since been attending Alcoholics Anonymous and Narcotics Anonymous meetings. From May, 1995 to October, 1996, Dr. Hellman performed his occupation as anesthesiologist with the only work restriction being that he did not exceed forty hours a week. As an anesthesiologist, Dr. Hellman was responsible for ordering or administering to the patient preoperative drugs, which included a wide range of controlled substances like barbiturates, narcotics, general anesthetics, muscle relaxants, and sedative hypnotics. Plaintiff asserts that he ceased his anesthesiology practice altogether in 1996 "when it became apparent that drug cravings brought on by his constantly handling the substances made it impossible for him to safely and effectively treat his patients. He also feared a relapse into drug usage." (Doc. No. 19, Pl. Stmt. Undisp. Facts ¶ 14.) Defendant admits to this, although there is a dispute as to Plaintiff's inability to continue to practice anesthesiology, beyond his personal fears. (Doc. No. 33, Resp. ¶ 14.)

In 1994, Plaintiff submitted a proof of claim for the disability of opiate dependency. Between 1994 and December of 1997, UCLI paid monthly benefits under the two policies. Defendant asserts that in 1997, Dr. Dodd advised UCLI that Plaintiff had fulfilled his obligations under the Talbot "contract of recovery" and anticipated no problems with his recovery. In 1998, UCLI reviewed Dr. Hellman's claim and determined that he was not disabled under the terms of the policies and no further payments would be made. Dr. Hellman asked UCLI to reconsider its decision, and he submitted the results of a 1998 evaluation from Talbot Marsh stating that due to his "inability in the operating room" he was "unsafe to practice anesthesiology." (Doc. No. 19, Pl. Stmt. Undisp. Facts ¶ 18.) Plaintiff also submitted a 1999 Report from his personal psychiatrist stating that he "should never return to the practice of anesthesiology." (*Id.*)

Defendant acknowledges receiving the reports, but disputes the report's conclu-

sions regarding disability, which it claims "contradicted the objective evidence reviewed by Union Central that Plaintiff's chemical dependency was, and still is, in full sustained remission...." (Doc. No. 33, Resp.¶ 18.) Defendant denied the reconsideration request. Thereafter, Plaintiff filed the instant action in June 2000. In support of his claim, he submitted Dr. Hedberg's Rule 26 Report stating his opinion that "plaintiff is permanently disabled from the ability to perform ... anesthesiology in that he is unable to safely engage in those duties." (Pl. Stmt. Undisp. Facts ¶ 21.) Defendant denies that Dr. Hellman is permanently disabled, and asserts that he is "physically and mentally capable of performing the duties of an anesthesiologist" and further notes that Plaintiff "maintains an unrestricted license to practice medicine." (Def.Resp.¶ 21.) While admitting to be physically able to perform as an anesthesiologist, Plaintiff denies being mentally capable to do so. (Doc. No. 29, Pl. Resp. to Def. Stmt. Undisp. Facts ¶¶ 37,38.)

## II. LEGAL STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c).

A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An alleged factual dispute existing between the parties is not sufficient to defeat a properly supported summary judgment motion. *Id.* at 247–48, 106 S.Ct. 2505. The court must

determine that a reasonable jury would be unable to return a verdict for the non-moving party in order to enter summary judgment. *Id.* at 249, 106 S.Ct. 2505. Material facts are those which, under the substantive law governing the issue, might affect the outcome of the suit. *Id.* at 247, 106 S.Ct. 2505.

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the non-moving party may not rely solely on conclusory allegations, but rather must come forth with affirmative evidence which establishes its claims and raises an issue of genuine material fact. *Id.* at 324, 106 S.Ct. 2548. This is true even when the court is presented with cross-motions, "each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988). The court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

It is undisputed that under the policies, sickness is defined as "any sickness or disease first manifested while this policy is in force." (Depo. Hellman, Ex. 3 at 2; Ex. 4 at 2.) They define total disability as disability which: (1) begins while the policy is in force; (2) results from injury or sickness; (3) requires regular physician care; and (4) continuously prevents insured from engaging in the regular occupation the insured had when the disability began. (*Id.,* Endorsement Pages.)

### A. *Whether Plaintiff is totally disabled to perform his regular occupation under the policies*

Policy No. 053593H specifically provides that the insured will be considered "totally disabled if, due to sickness or injury, [he is] unable to engage in [his] occupation, [defined as his] occupation at the time a disability began." (*Id.*, Ex. 4 at 3.) Undisputedly, Plaintiff's sickness, his chemical dependency, has been in full remission since Labor Day, 1994, and he is physically able of performing the duties of an anesthesiologist. (Depo. Hellman at 77, 140–41.) The question is whether that dependency, even in full remission, impairs Plaintiff's mental capacity to practice in the occupation of anesthesiologist.

Plaintiff explains, and is not disputed, that "occupational disability" policies such as the two he has acquired from Defendant, "become operative when the insured can no longer engage in his regular occupation." (Doc. No. 17, Pl. S.J. Mot. at 6.) In interpreting the insurance policy, the parties agree that the occupation of a physician is limited to his specialty area practice, in this case anesthesiology. (*Id.*)[1] Here, the disease is Plaintiff's " 'Polysubstance dependence, [in] full sustained remission in a controlled environment.' " (*Id.* at 8 (*quoting* Dr. Hedberg Rule 26 Report).) Plaintiff asserts that the core of his disability is that he "is required to handle and administer the very drugs

which once fueled the drug habit." (*Id.* at 8–9.)

Even though the facts are not in dispute, the inferences to be drawn from these material facts are disputed. In support of his motion, Plaintiff has submitted the following evidence: (1) Dr. Hedberg Rule 26 and his deposition testimony concluding that Plaintiff's disabling condition is his inability to "practice anesthesia in a safe and competent manner that would ... provide his patients with adequate care that is safe for them;"[2] (2) the opinion of Dr. Wilson who evaluated Plaintiff at Talbot in 1998 and found him "unsafe to practice anesthesia" because of his "instability in the operating room" (Pl. Doc. No. 20, Tab 8, p. 3, Discharge Summary from Talbot); and (3) the opinion of Plaintiff's own psychiatrist stating that he "should never return to the practice of anesthesiology under any circumstances ..." (*Id.*, Tab 9, p. 2, Letter from John Harris, M.D.)

Opposing the statements, Defendant asserts that "[a]s a matter of law and fact, Plaintiff is 'capable of engaging in the occupation' of anesthesiology." (Doc. No. 30 at 4.) In rejecting the conclusion that Plaintiff is totally disabled, Defendant submitted Dr. Athlstan's Psychiatric Review stating that "there is no basis in behavioral science or the clinical practice of addictionology for believing that exposure to anesthesiology work would, by itself, cause any limitation or increase the risk of re-

---

**1.** Relying on *Continental Casualty Co. v. Novy*, 437 N.E.2d 1338 (Ind.App.1982) (surgeon considered disabled due to loss of fingers despite continuing to practice general medicine); *Dixon v. Pacific Mutual Life Ins. Co.*, 268 F.2d 812 (2nd Cir.1959)(*idem* when surgeon had dermatitis of the hands precluding surgical practice). *See also* (Doc. No. 30, Def. Resp. at 4 (stating anesthesiology as Plaintiff's occupation).)

**2.** "One of the most disabling problems for opiate dependent anesthesiologists is the tre-

mendous distracting obsession about their drug of choice. During surgery and administration of anesthetics, many anesthesiologists are fighting obsession and craving ... due to their obsessions, the anesthetized patients are receiving their partial attention and are being placed at an unacceptable risk during surgery ... [Thus,] the anesthesiologist is incapable of performing the substantive duties of their job." (Pl. Doc. No. 20, Tab 10, p. 11, Dr. Hedberg Report.)

lapse." The Review concludes that Dr. Hellman "is fully capable of working full time in anesthesiology or any other occupation for which he is qualified." (Def.Doc. No. 31, Ex. J.) Defendant has also submitted other relevant evidence, though not directly on point.[3]

Both parties have moved for summary judgment on this issue, but neither party clearly established "the non-existence of any genuine issue of fact material to a judgment in his favor." *United States v. Articles of Device etc.*, 527 F.2d 1008, 1011 (6th Cir.1976). Plaintiff carried his initial burden submitting evidence in support of summary judgment in his favor on the disability to practice anesthesiology issue. However, Defendant has came forward with "affirmative evidence" which, when interpreted in the light most favorable to UCLI, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, creates a genuine dispute as to whether Plaintiff's dependency "continuously prevents insured from engaging in the regular occupation" of anesthesiology. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

On the other hand, the portion of Defendant's Motion dealing with the dependency issue, has failed to present "evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold*, 863 F.2d at 236 (2d Cir.1988). In showing that Plaintiff is not mentally impaired to practice anesthesiology, Defendant relies on Plaintiff's statement that he is "not mentally impaired *to be a doctor.*" (Doc. No. 23 at 14 (Depo. Hellman at 166)) (emphasis added). UCLI also relies on Plaintiff's having a valid license to practice medicine in various states, and on several cases rejecting disability. (*Id.* at 14–16.) However, these cases are distinguishable because they either involve claimants who were not legally able to practice the profession,[4] or cases where their ability to do so was not in dispute.[5] The reminder of the Motion provides that Plaintiff's fear of relapse is non-compensable, which Dr. Hellman acknowledges.[6]

3. Some of the documents confirm Plaintiff's ability to work, which he does not dispute, but do not specify his ability to perform in his "regular occupation" as anesthesiologist, which is the crux of the dispute. *See e.g.*, (Ex. E and G, Letters from Dr. Dodd (concluding that Plaintiff has fulfilled all obligations with his Talbot continuing care contract); Ex. C, Letter from Dr. Dodd (anticipating "full re-entry into the workplace within a period of six months).) While some others, simply emphasize that Plaintiff's dependency is in full remission, which is undisputed as well. *See e.g.*, (Ex. B, Evaluation by Dr. Prewit; Ex. D, Letter Dr. Dodd; Ex. G, Letter Dr. Olbrich).

4. *See e.g., Massachusetts Mutual Life Ins. Co. v. Millstein*, 129 F.3d 688, 690 (2nd Cir.1997); *Goomar v. Centennial Life Ins. Co.*, 855 F.Supp. 319, 320–23 (S.D.Cal.1994), *aff'd* 76 F.3d 1059 (9th Cir.1996) (differentiating between "legal" and "factual" disability, since complain-ants' professional licenses revoked due to criminal acts arising from their substance dependency).

5. *See e.g., Grayboyes v. Gen. Am. Life Ins. Co.*, 1995 WL 156040, 1995 U.S. Dist. LEXIS 4233 (E.D. Pa. April 4, 1995); *Dang v. Northwestern Mutual Life Ins. Co.*, 960 F.Supp. 215, 218 (D.Neb.1997) (no dispute that doctor and dentist respectively, were capable of performing their duties, the problem was that external legal limitations made it impossible to do so in practice.) Finally, there is a case with identical facts also involving an anesthesiologist's dependency in full remission, where the district court granted judgment for the insuror. *See Allen v. Minnesota Life Ins. Co.*, 2001 U.S. Dist. Lexis 10460 (N.D.Ga.2001). However, the expert testimony concluding that plaintiff could not return to practice anesthesiology was based on his "potential for relapse." *Id.*

6. Plaintiff's Reply states that cravings and mental distraction while operating "is the heart of Dr. Hellman's claim for disability and not a generalized fear of relapse." (Doc. No. 35 at 2.)

Thus, summary judgment on this issue is not proper because there is a factual dispute as to Plaintiff's mental limitations on his ability to practice anesthesiology. *See Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. However, regardless any finding as to Plaintiff's total disability, summary judgment may be appropriate if the disability is excluded under the policies' definition of disease, which the Court will address next.

B. *Whether Plaintiff's condition first manifested itself while the policies were in force*

To be disabled under UCLI's insurance policies, the insured must have a disability which "[b]egins while the policy is in force" and "[r]esults from injury or sickness." (Depo. Hellman, Ex. 3 and 4.) Sickness under the policy is defined as "any illness or disease first manifested while this policy is in force." (*Id.*, Ex. 3 and 4 at 2.) Defendant argues that summary judgment in its favor should be granted as a matter of law because, even if Plaintiff is disabled, his condition is not covered under the policies, since it did not first manifest itself within the policy periods. (Doc. No. 23 at 16.) However, the policy does not define "first manifestation."

 In interpreting these policies, a federal court sitting in diversity must apply the same substantive law that would be applied if the action had been brought in a state court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Interpreting similar language under the Workmen's Compensation notice statute, the Tennessee Supreme Court understood "the first distinct manifestation" of occupational disease as the moment when "the symptoms reached the point where doubt was so far removed as to enable a physician to diagnose the trouble as [such]." *Christopher v. Consolidation Coal Co.*, 222 Tenn. 727, 737, 440 S.W.2d

281 (Tenn.1969) (applying T.C.A. § 50–1107). Applying *Christopher* to a case involving a disability insurance, as in the current case, the Court of Appeals held that "[d]isease is manifest when it is capable of diagnosis by a physician." *Krakowiak v. Paul Revere Life Ins. Co.*, 1996 WL 303661, * 5, 1996 Tenn.App. Lexis 346, * 14 (Tenn.App. June 7, 1996). In light of these decisions, the Court finds that the high court would interpret "first manifestation" as the moment when the disease is "first capable of diagnosis by a doctor." *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir.1997).

 Defendant has the initial burden of proving that no genuine dispute exists before summary judgment may be granted. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. After summarizing Plaintiff's history of substance usage as described in the Facts Section, Defendant merely concludes that these facts "make clear that Plaintiff's chemical dependency first manifested itself, such that this condition was capable of diagnosis by a physician, well in advance of the policies going into effect." (Doc. No. 23 at 18–19.) In his Response, Plaintiff brings forward affirmative evidence in the form of expert testimony, which rejects UCLI's conclusory allegation and creates a genuine issue of material fact as to whether Plaintiff's dependency first manifested itself prior to the policies being in force. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *see also* (Hedberg Depo. at 39, 48 (stating inability to determine when Hellman's drug use became "addiction" capable of diagnosis).) Therefore, summary judgment is not appropriate because a reasonable jury could return a verdict in favor of either party. *See Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. However, Plaintiff argues that regardless when the illness was first manifested and in light of state insurance law, his alleged disability would still be covered under these policies by operation of the incontestability clauses.

### C. Whether Defendant is barred from denying coverage by the incontestability clauses

■ The policies have "Incontestability Clauses" stating as follows:

The Company may contest a claim or the validity of this policy if a material misrepresentation was made in the application. The Company will not contest the validity of this policy after it has been in force during the life of the Insured for two years from the Policy date. No claim for loss incurred or disability commencing after two years from the Policy Date will be denied or reduced because a disease or physical condition existed before the Policy Date unless it is excluded from the policy by name or specific description.

(Pl. Doc. No. 20, Tab 2, p. 11, Disability Policy # 040268H.)

The policies further provide that if the disability is caused by a "pre-existing condition", the company will pay no benefits unless: "(1) Disability starts two years after the Policy Date; or (2) The pre-existing condition was disclosed in the application and not excluded from coverage by name or specific description." (Disability Policy # 040268H.) The 1983 policy also defines "pre-existing condition" as "a disease or a physical or medical condition for which:

1. There existed symptoms within a five year period prior to the Policy Date which would cause a prudent person to seek diagnosis, care or treatment; or

2. Treatment or medical advice was recommended by or received from a physician or health care facility within the five year period prior to the Policy Date. (*Id.*)

Similarly, the 1986 policy states that the insurance company:

... will not contest this policy based on statements in the application if the policy has been in force during your life for two years from the Policy Date, excluding any period during which you were disabled. However, prior to that time, we may contest your claim or void your policy if you made material misrepresentations on your application. (Pl. Doc. No. 20, Tab 3, p. 11, Disability Policy # 053593H.)

The policy further defines "pre-existing condition" as "the existence of symptoms which would cause an ordinarily prudent person to seek diagnosis, care or treatment or a condition for which medical advice or treatment was in fact recommended by a physician...." (Id.)

Defendant acknowledges that such language is statutorily required under Tennessee Code Annotated ("T.C.A.") § 56–26–108, which among its required insurance provisions states that:

(A) After two (2) years from the date of issue of this policy, no misstatements, except fraudulent misstatements, made by the applicant in the application for this policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two-year period.

. . . . .

(B) No claim for loss incurred or disability (as defined in the policy) commencing after two (2) years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage ... had existed prior to the effective date of coverage of this policy. T.C.A. § 56–26–108(2).

The issue is the application of the incontestability clauses to Dr. Hellman's policies, as they would be interpreted under Tennessee law. UCLI predicts and rejects Plaintiff's response stating that the "incontestability" and "pre-existing condition" clauses entitle him to recovery under his policies. (Doc. No. 23 at 20.) UCLI

argues that neither clause "expand[s] the scope of the policies coverage beyond those conditions which first manifest during the policy period." (*Id.* at 21–22.) [7] Though there is no Tennessee Supreme Court case directly on point, UCLI relies on *Krakowiak, see supra,* supporting a distinction between "manifestation" of an illness and a "pre-existing condition" (*Id.* at 24.) Defendant asserts that, while it is barred from contesting the validity of the policy in the presence of a pre-existing condition not earlier manifested, it may deny coverage if the condition "first manifested" itself prior to the policy being in force. (*Id.* at 25.)

On the other hand, Plaintiff relies on *Equitable Life Assurance Soc. of the U.S. v. Poe,* 143 F.3d 1013 (6th Cir.1998), for the contrary interpretation. Also dealing with a diversity case, the Sixth Circuit addressed the issue in the context of an insurance clause required by a Michigan statute similar to that applicable in this case. *See id.* The Sixth Circuit acknowledged that the validity of the "first manifestation" doctrine was an issue of first impression, but unlike our case "none of the Michigan courts ha[d] yet spoken" on the issue. *Id.* In deciding to follow the minority view, the Court "concluded that the insurer could not escape liability based upon such a distinction since 'the term 'exist' in its ordinary sense refers broadly to a state of being, without reservation as to other qualities, including manifestation.' " *Id.* (*quoting Equitable Life Assurance Soc. of the U.S. v. Bell,* 27 F.3d 1274. 1281 (7th Cir.1994).)

Though not controlling, the judgments of lower state courts are "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. A.T.&T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *see also* Tenn. Ct. Rule 4 (unpublished opinions are persuasive). In this case, the Court is faced with a decision by the Tennessee Court of Appeals directly on point, *see Krakowiak,* which asserts that "Tennessee has adopted the majority rule that an incontestability clause limits only the insurer's ability to contest that validity of a policy ...; the clause does not expand coverage beyond the terms of the policy." 1996 WL 303661, * 5, 1996 Tenn.App. Lexis 346,* 13.[8] In supporting its holding, *Krakowiak* relies on two decisions by the State Supreme Court, which though factually distinguishable, clearly establish the proposition that a contestability clause goes to the validity of the policy, without affecting its scope.[9]

The Court applies the *Krakowiak* reasoning which recognizes a distinction between "first manifest" and "pre-existing"

7. In support of the proposition that incontestability clauses do not broaden coverage, cited: *Keaten v. Paul Revere Life Ins. Co.,* 648 F.2d 299, 301 (5th Cir.1981); *Button v. Connecticut Gen. Life Ins. Co.,* 847 F.2d 584, 587–88 (9th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 250 (1988); *Massachusetts Casualty Ins. Co. v. Forman,* 516 F.2d 425, 428 (5th Cir.1975); etc.

8. *See e.g., Neville v. American Republic Ins. Co.,* 912 F.2d 813, 815 (5th Cir.1990) (finding that "sickness" defined in the policy to mean " 'a condition ... first manifested ... while that policy is in force' " it concluded that the clause cannot be interpreted to require coverage of a condition that was never covered by the policy in the first place); *National Life & Accident Ins. Co. v. Mixon,* 291 Ala. 467, 282 So.2d 308, 316 (1973) (also finding exist/manifest distinction to be sound); *see also Paul Revere Life Ins. Co. v. Haas,* 137 N.J. 190, 644 A.2d 1098 (1994), (holding distinction valid because the legislature could not have "intended the incontestability clause to serve as an invitation for fraudulent applications for disability insurance.").

9. *Citing Scales v. Jeffers on Standar Life Ins. Co.,* 295 S.W.2d 58, 60 (Tenn.1927) and *Searcy v. Fidelity Bankers Life Ins. Co.,* 656

for purposes of the policies' contestability clauses, and hereby grants summary judgment for Defendant, because all the relevant data before this Court suggests that the highest court would so decide if confronted with a similar factual pattern. *See West, supra.*

The policies entitle Plaintiff to benefits if a disability which "[b]egins while the policy is in force" and "[r]esults from injury or sickness" prevents him from practicing anesthesiology. In defining disability causing "sickness" under the policy, coverage is limited to "any illness or disease first manifested while this policy is in effect." (Depo. Hellman, Ex. 3 and 4 at 2.) Therefore, if the fact-finder were to conclude that Dr. Hellman's occupational disability resulted from "disease" that "first manifested" itself prior to the policies being in effect, then such disability would be explicitly precluded from coverage and the incontestability clause would be inapplicable. The incontestability clause would only prevent a denial of Plaintiff's disability claim where the condition or disease existed prior to the policies effective date but without previous manifestation.

## IV. CONCLUSION

Therefore, for the reasons stated above, the Court hereby DENIES Plaintiff's Motion for Summary Judgment, and it partially GRANTS but partially DENIES Defendant's cross-Motion.

(A) The Court hereby DENIES Plaintiff's Motion for summary judgment, and it GRANTS summary judgment in favor of either party as to the question regarding Plaintiff's disability to perform his regular occupation of anesthesiology under the policies, because this fact-intensive issue is properly determined by the jury.

(B) The Court also DENIES Defendant's summary judgment request on the issue whether Plaintiff's condition first manifested itself while the policies were in force. However, the Court finds that in making a determination as to the "first manifestation" of the disease, the proper inquiry is into the date/time when the disease or medical condition was *first capable of diagnosis,* rather than inquiring about the date when it was *actually diagnosed.*

(C) Finally, the Court GRANTS summary judgment in favor of Defendant as it relates to the application of the incontestability clause to the current policies, and the interpretation of the "pre-existing condition" and "first manifestation" clauses in the context of an occupational disability policy.

It is so ORDERED.

S.W.2d 39, 41 (Tenn.App.1983) (holding that "[i]ncontestability clauses such as codified above, while precluding the raising of the defense that an insurance policy is invalid, do not affect the raising of coverage questions by the insurer" while relying on *Smith v. Equitable Life Assurance Soc.,* 169 Tenn. 477, 89 S.W.2d 165, 167 (1936)).