PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT R. STANFORD,
          *Plaintiff-Appellant,*

v.

CONTINENTAL CASUALTY COMPANY,
          *Defendant-Appellee.*

⎫
⎬  No. 06-2006
⎭

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(5:05-cv-00372-BR)

Argued: September 26, 2007

Decided: January 23, 2008

Before WILKINSON, Circuit Judge, HAMILTON, Senior Circuit
Judge, and T. S. ELLIS, III, Senior United States District Judge for
the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Senior District Judge Ellis wrote the
majority opinion, in which Senior Judge Hamilton joined. Judge Wil-
kinson wrote a dissenting opinion.

## COUNSEL

**ARGUED:** John Richard Rittelmeyer, HARTZELL & WHITEMAN,
L.L.P., Raleigh, North Carolina, for Appellant. Debbie Weston Har-
den, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Char-
lotte, North Carolina, for Appellee. **ON BRIEF:** Katherine T. Lange,

WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellee.

---

**OPINION**

ELLIS, Senior District Judge:

In this ERISA case, appellant Robert Stanford asks us to reverse appellee Continental Casualty Company's denial of long term disability benefits because, he argues, Continental's determination was unreasonable. The district court affirmed Continental's determination, finding that the matter fell within the discretion of the plan administrator and rejecting Stanford's argument that the determination was procedurally improper. For the reasons that follow, Continental's denial of benefits is affirmed.

I.

Appellant Stanford is a trained nurse anesthetist, a health care professional responsible for administering anesthesia to patients undergoing surgical and obstetric procedures. Stanford was employed in this capacity at the Beaufort Memorial Hospital in Beaufort, South Carolina beginning in April, 2002. Among the drugs Stanford administered was Fentanyl, a powerful painkiller and narcotic. Stanford began self-administering Fentanyl, and by September 2003 he was addicted to the drug.

Stanford left his position at Beaufort and entered an addiction treatment and rehabilitation program in October 2003. After completing the program, but before returning to work, Stanford relapsed and entered a second treatment program in November, 2003, where he remained for three months. Stanford was discharged in late February, 2004, and was approved to return to work on March 8, 2004.

While attending this second treatment program, Stanford applied to appellee Continental for long term disability benefits. Continental, which both insured and administered Beaufort's employee benefit plan, approved Stanford's application.

Stanford returned to work on March 12, 2004, but quickly began taking Fentanyl again. He left work for a second time on May 19, 2004 and again sought treatment for his drug use. While undergoing treatment in Georgia, Stanford again applied to Continental for long term disability benefits. Continental approved this second application for the duration of Stanford's inpatient treatment in Georgia, but notified him that his claim remained under review.

In December, 2004, a registered nurse consultant with Continental spoke to Stanford's treating physician, who indicated that Stanford no longer suffered any impairment that would prevent him from performing the duties of his occupation as a nurse anesthetist. Based on this representation, Continental terminated Stanford's long term disability benefits in January, 2005.

Stanford requested administrative review of the termination decision, providing letters from his treating physician indicating that Stanford remained at risk for relapse if exposed to Fentanyl, as well as an article from a medical treatise discussing the risk of relapse among anesthesiologists. Stanford also indicated that the South Carolina Board of Nursing had restricted his license, prohibiting him from having access to narcotics or working as a Certified Registered Nurse Anesthetist.

Continental, acting pursuant to its discretionary authority as plan administrator,[1] denied Stanford's appeal on February 21, 2005, writing that "the policy does not cover potential risk," and that Stanford was therefore not entitled to further long term disability benefits. Having exhausted his administrative remedies, Stanford filed the present lawsuit seeking to reverse Continental's denial of benefits. The district court granted Continental's Motion for Summary Judgment on August 7, 2006, and Stanford appeals.

---

[1]The benefit plan explicitly provides that "[t]he plan administrator and other plan fiduciaries have discretionary authority to determine *Your* eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to Continental Casualty Company to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy."

## II.

Our analysis must begin with a statement of the appropriate standard of review. This court has developed a "well-settled framework for review of the denial of benefits under ERISA plans." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). Where a plaintiff appeals a grant of summary judgment, we review the denial of benefits *de novo*. *Id.* And when the plan at issue grants the administrator discretionary authority to determine eligibility or to construe the terms of the plan, the denial decision must be reviewed for abuse of discretion. *Id.* Generally, this abuse of discretion standard means that an administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion. *Id.* Yet, we have often recognized that a conflict of interest exists when a benefit plan is administered and funded by the same party, as is the benefit plan at issue here. The reviewing court must consider this conflict of interest in determining whether the administrator has abused its discretion; in other words, "the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 87 (4th Cir. 1993). Nevertheless, precedent in this circuit makes clear that "in no case does the court deviate from the abuse of discretion standard," *Ellis*, 126 F.3d at 233. In other words, the reduced deference standard does not require the reviewing court to construe every contract ambiguity in favor of the claimant. To hold otherwise would effectively erase the plan provision granting the administrator discretion to construe plan terms. Instead, where, as here, the plan is administered and funded by the same party, the court applies a sliding scale according to which the plan administrator's decision must be more objectively reasonable and supported by more substantial evidence as the incentive for abuse of discretion is shown to increase. *Id*. at 228.

Importantly, the mere existence of a conflict of interest is insufficient to demonstrate an abuse of discretion. If it were sufficient, a conflicted plan administrator would never be able to make an adverse benefit determination, for a benefit applicant would always be able to have the adverse ruling reversed on appeal. Instead, a plaintiff must produce some evidence indicating that the adverse decision was moti-

vated by the conflict. Such evidence might be intrinsic, such as an internal communication directing the adverse ruling, or it might be extrinsic, such as the fact that other administrators not operating under a conflict of interest had interpreted substantially identical plan provisions in favor of the applicant. Absent such evidence, courts are unable to review benefit decisions effectively while adhering to the clearly established abuse of discretion standard.

Additionally, the existence of a conflict of interest is only one factor to be considered in reviewing a denial of benefits for abuse of discretion. The reviewing court must also consider, to the extent relevant, (1) the scope of discretion conferred; (2) the purpose of the plan provision in which discretion is granted; (3) any external standard relevant to the exercise of that discretion; and (4) the administrator's motives. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996).

Stanford and Continental agree that the plan grants Continental, as plan administrator, discretionary authority to determine eligibility and to construe the terms of the plan. The parties also agree that Continental both administers and funds the plan. Accordingly, we review Continental's decision denying Stanford long term disability benefits under the modified abuse of discretion standard, reducing our deference only to the degree necessary to neutralize any untoward influence resulting from Continental's conflict of interest, as shown in the record.

## III.

Stanford argues that Continental abused its discretion in two respects when it denied him long term disability benefits in January, 2005. First, he argues that Continental applied an unreasonably restrictive interpretation of the benefit plan when it concluded that the plan did not apply to the potential risk of relapse. Second, he argues that Continental violated ERISA regulations by issuing its denial of benefits without consulting a health care professional. We address each argument in turn.

## A.

Stanford first argues that Continental's interpretation of the terms of the benefit plan was unreasonably restrictive. To qualify for long

term disability benefits under Beaufort's benefit plan, a claimant must establish a "disability," which for the purposes of the plan means "injury or sickness caus[ing] physical or mental impairment to such a degree of severity that you are . . . continuously unable to perform the material and substantial duties of your regular occupation." Although Continental did not contest Stanford's characterization of his addiction as a sickness, it concluded that since Stanford no longer suffered from physical or mental impairments as a result of his drug use or his recovery, the fact that he remained an addict did not render him "unable to perform the material and substantial duties of [his] regular occupation."

Stanford argued in his administrative appeal that his addiction did render him unable to perform his duties because of the high risk that he would relapse into drug use if exposed to Fentanyl in the workplace. Continental rejected this argument, concluding that "[t]he policy does not cover potential risk" of relapse. We cannot say that Continental's conclusion is unreasonable, even in light of Continental's conflict of interest as insurer and administrator of the benefit plan, and we must accordingly affirm.[2]

Stanford cites a number of cases in support of his argument that risk of relapse is a form of disability under ERISA-governed benefit plans. Many of these cases involve the risk of recurrence of a physical condition such as a heart attack.[3] But the risk of a heart attack is different from the risk of relapse into drug use. A doctor with a heart condition who enters a high-stress environment like an operating room "risks relapse" in the sense that the performance of his job

---

[2]The dissent characterizes this result as creating an equitable exception to the benefit plan's promise of coverage. This misreads our opinion, which is no more than a conventional application of the appropriate standard of review in circumstances where, as here, there is an ambiguity in the language of the benefit plan and the plan administrator enjoys discretionary authority to construe the plan terms. It is not the place of the reviewing court to substitute its own conclusion for the reasoned decision of the plan administrator. *Ellis*, 126 F.3d at 232.

[3]*See, e.g.*, *Saliamonas v. CNA, Inc.*, 127 F. Supp. 2d 997 (N.D. Ill. 2001); *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003).

duties may *cause* a heart attack. But an anesthetist with a drug addiction who enters an environment where drugs are readily available "risks relapse" only in the sense that the ready availability of drugs increases his temptation to resume his drug use. Whether he succumbs to that temptation remains his choice; the heart-attack prone doctor has no such choice.[4]

More apposite are those cases cited by Stanford in which courts have found the risk of relapse to satisfy definitions of disability similar to the language of the benefit plan here.[5] But these cases do not settle the matter, both because they are not authoritative and because there exist directly contradictory cases.[6] This disagreement among the courts demonstrates that reasonable minds can, and do, differ as to whether the risk of relapse renders an addict unable to perform the material and substantial duties of his work. Given this widespread, thoughtful, and reasonable disagreement, Continental's decision cannot plausibly be termed unreasonable.[7]

Finally, Stanford has not shown that Continental's conflict of inter-

---

[4]We do not mean to suggest that it is easy to overcome an addict's temptation, merely that the availability of this choice, however difficult to make, distinguishes Stanford's condition from those of heart-attack-prone doctors.

[5]*See, e.g. Royal Maccabees Life Ins. Co. v. Parker*, 2001 WL 1110489 (N.D. Ill. 2001) (finding, in a non-ERISA case, that it was unreasonable to require a physician-addict to risk relapse by returning to work in order to demonstrate actual physical inability to perform his duties), *vacated by settlement*, 2003 WL 22019779 (N.D. Ill. 2003).

[6]*See, e.g. Allen v. Minnesota Life Ins. Co*, 216 F. Supp. 2d 1377 (N.D. Ga. 2001) (rejecting an anesthesiologist-addict's claim that "future potentialities rather than any present impediment to plaintiff's return" to work qualified as a disability under an ERISA-governed benefit plan).

[7]Stanford cites other cases in which the question whether risk of relapse constitutes a disability has been put to the jury. *See, e.g. Hellman v. Union Central Life Insurance Co.*, 175 F. Supp. 2d 1044, 1049-50 (M.D. Tenn. 2001); *Brosnan v. Provident Life and Accident Insurance Co.*, 31 F. Supp. 2d 460, 464 (E.D. Pa. 1998). These cases merely emphasize that there exists no single legally required answer to this difficult question.

est affected its decision in any way. As noted above, the modified abuse of discretion standard diminishes our deference to the plan administrator's decision, but only to the degree necessary to offset any conflict of interest.[8] Stanford has not shown that the conflict had any effect on Continental's decision, and to overturn that decision simply because Continental was conflicted would eliminate deference entirely. Accordingly, even under a modified abuse of discretion standard, we must defer to Continental's determination that the benefit plan did not cover risk of relapse.

We are not unsympathetic to Stanford's argument that Continental's policy would require him to return to work and in fact suffer a relapse in order to qualify for long term disability benefits. We recognize that this creates a somewhat troubling—some might say perverse—incentive structure: an addict who continues to abuse drugs will be entitled to long-term benefits, but upon achieving sobriety will lose those benefits unless he again begins to abuse drugs. Although this argument is not without force, it operates on a false assumption, namely that disability benefits are a sort of reward for sobriety. In fact, sobriety's reward is the creation of innumerable opportunities that were closed to Stanford as long as he continued to use drugs. These newfound opportunities do not include a return to his former job as a nurse anesthetist, but this is the result of a license limitation and the prudence of employers, not any physical disability or mental impairment. No prudent employer would hire Stanford into a job in which he administered the drug to which he is addicted, just as no prudent employer would hire a recovering alcoholic as a bartender. More importantly, no prudent addict would place himself in such a position. Such prudence is a part of recovery, and it can have significant costs—but these costs are greatly outweighed by the opportunities sobriety provides. It is important to remember that Stanford is not physically disabled or mentally impaired; though prudence and his license dictate that he cannot return to his old job administering Fentanyl, he is physically and mentally capable of performing that job—and countless other jobs. It would be truly perverse if Stanford were to go on to great success in another occupation but was still able to collect insurance checks on the basis of "disability."

---

[8]*Doe*, 3 F.3d at 87.

In sum, we cannot say that Continental abused its discretion when it concluded that the risk of relapse into addiction did not constitute a "disability" under the terms of the benefit plan. Continental's determination is therefore entitled to our deference, and we affirm the denial of benefits on this ground.[9]

## B.

Stanford also argues that Continental's denial of benefits was unreasonable because Continental violated ERISA's procedural requirements. Specifically, Stanford claims that Continental failed to consult a health care professional in determining that his risk of relapse did not constitute a disability, and he alleges that Continental failed to consider the materials he submitted in support of his initial appeal.

Stanford first points to a Department of Labor regulation that provides:

> [I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

29 C.F.R. § 2560.503-1(h)(3)(iii). Although Continental concedes that it did not consult a health care professional, it maintains that its decision was not based on any medical judgment. Continental is correct, and its failure to consult a health care professional is not a ground for reversal.

---

[9]Our conclusion makes it unnecessary to consider whether Stanford would have qualified for benefits had the policy covered risk of relapse. Although Stanford's treating physician opined that Stanford was "unable" to return to his duties as a nurse anesthetist, the record is anemic with regard to the relative likelihood that Stanford would choose to resume his drug abuse. But Continental's denial of benefits was based on its interpretation of the benefit plan, not on Stanford's evidentiary showing, and the denial is affirmed herein on this ground.

Stanford argues that Continental's denial of benefits necessarily implicated matters of medical judgment. This is not true. Continental did not dispute the medical judgment of Stanford's treating physician that Stanford suffered no physical impediment to the performance of his work but remained at risk of relapse if he returned to an environment where he was required to administer Fentanyl. Continental's denial of benefits was based solely on its determination that such a risk of relapse did not fall within the benefit plan's definition of "disability." This determination was contractual, not medical. Put differently, consultation with a health care professional would not have yielded any information touching on the appropriate interpretation of the term "disability" in the benefit plan. The benefit plan explicitly grants Continental sole discretionary authority to interpret its terms and provisions, and accordingly Continental was under no obligation to consult a health care professional in exercising this discretionary function.

Stanford also suggests that Continental abused its discretion by failing to consider the materials he submitted in support of his appeal of the denial of benefits. *See* 29 C.F.R. §§ 2560.503-1(h)(2)(iv) and (4) (2002). But Stanford has introduced no evidence to support an inference that Continental failed to consider his submitted materials prior to the issuance of its decision. The fact that Continental was not persuaded by Stanford's submission does not mean that it did not consider it. Accordingly, Stanford has not shown that Continental violated ERISA's procedures in denying his application for long term disability benefits.

In sum, Continental did not abuse its discretion in denying Stanford's application for long term disability benefits, and the denial must therefore be affirmed. Continental's determination that risk of relapse was not a form of disability under the benefit plan was reasonable, even if strong arguments exist to the contrary; its failure to consult with a health care professional in making that determination was not improper since the decision was contractual rather than medical; and the fact that it was not persuaded by Stanford's submissions does not support an inference that Continental improperly disregarded those submissions. The district court was correct to grant summary judgment, and we affirm.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

The majority's position rests on two abstractions: first, that a disability plan need not cover "potential risk of relapse," and, second, that for disability purposes, "a physical condition such as a heart attack . . . is different from the risk of relapse into drug use." *Ante* at 5-6. Neither abstraction is grounded in law. The text of Continental's plan designates addiction as a mental disorder and covers mental disorders so long as they make a claimant continuously unable to perform the duties of his previous occupation. All record evidence indicates that, because of his addiction, Stanford cannot return to work in anesthesiology with any reasonable degree of safety. The majority has in effect used its equitable power to authorize an unwritten exception to Continental's textual promise of coverage, and thereby accomplished an uncommonly harsh result. I respectfully dissent.

## I.

The textual case in Stanford's favor is straightforward: "Disability," the Plan states, "means that . . . injury or sickness causes physical or mental impairment to such a degree of severity that you are: (1) continuously unable to perform the material and substantial duties of your regular occupation; and (2) not gainfully employed." A claimant who satisfies that definition is entitled to benefits. As Continental states, "[t]here is no dispute that Stanford has a chemical dependency and addiction," *Brief of Appellee* at 10, or that drug addiction qualifies as a "sickness" that causes "mental impairment" (defined in the Plan as those disorders "found in the current diagnostic standards manual of the American Psychiatric Association," which devotes a full section to substance-related disorders, addiction notably among them). Indeed, that is why Continental paid Stanford benefits for as long as it did. No one doubts that Stanford was unemployed when Continental cut off his benefits. And — remarkably — no one, not even Continental itself, denies that Stanford cannot with any safety perform the duties of his regular occupation as an anesthesia nurse; indeed, not a shred of contrary evidence was ever presented in this case. How, then, can it be that he is denied benefits?

The majority answers by quoting with approval a statement from Continental's denial letter, "'the policy does not cover potential risk,'" and adding on its own the phrase, "of relapse." *Ante* at 6. But the phrase "potential risk" is a redundancy; "potential risk" is just risk. The majority's addition, "of relapse," might be read as a limiting reference to addiction, or it might not; addicts are not the only medical patients who relapse. The majority offers no further explanation, and Continental's explanation — "In sum and essence, a risk of relapse is not evidence of a current impairment; instead, it is a future, potential concern." — just deepens the confusion. *Brief of Appellee* at 18-19. All agree that Stanford cannot presently return to work in safety, and if we ask why not, the answer must be some *existing*, not future, impairment — namely, Stanford's fentanyl addiction.

The chief problem with excluding "potential risk of relapse" from coverage is that the exclusion has no support whatsoever in the language of the Plan. While the majority seeks to couch Continental's decision as an exercise of discretion, an administrator lacks discretion to disregard the plain terms of its own plan. "The award of benefits under any ERISA plan," this circuit has said, "is governed in the first instance by the language of the plan itself." *Lockhart v. United Mine Workers of Am. 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993). The Plan's stated definition of disability is functional and encompasses any injury or sickness whose effect is to make one continuously unable to work, as a grave medical risk certainly can. The Plan does contain an "Exclusions and Limitations" section that lists such things as elective cosmetic surgery and pre-existing conditions, but nothing in that list speaks to "potential risk." In substance, then, the majority is permitting Continental to carve an unwritten exception out of the Plan's textual promise of coverage. Our circuit does not ordinarily permit this sort of equitable improvisation in ERISA cases, especially when its result is so harsh. *See* 29 U.S.C. § 1102(a)(1) (2000) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument."); *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir. 1997) (rejecting "unwritten modifications of ERISA plans"). There is a fair way to make exceptions to an ERISA plan, and that is to write them down before a claimant comes asking for benefits.

A second problem, as the majority itself admits, is that "Continental's policy would require [Stanford] to return to work and in fact suf-

fer a relapse in order to qualify for long term disability benefits." *Ante* at 8. Stanford's whole job was to administer drugs to patients, including those very substances to which he is by all accounts addicted. In other words, someone such as Stanford who has struggled back from addiction must now succumb to it again. The majority acknowledges that this result creates a "somewhat troubling — some might say perverse — incentive structure," and that Stanford "cannot return to his old job" in safety, but comforts itself that Stanford can work "countless other jobs." *Id.* This reasoning totally disregards Plan language defining disability as the inability "to perform the material and substantial duties *of your regular occupation*." Forcing Stanford to relapse into addiction or lose his benefits would also thwart the very purpose for which disability plans exist: to help people overcome medical adversity if possible, and otherwise to cope with it.

Finally, Continental's unwritten exception would seem to exclude all medical conditions whose critical effect is to create grave medical risk, conditions that make doing one's job, though not literally impossible, unreasonably dangerous. Continental's meditations on "current impairment" versus "potential risk" imply as much, and the position would at least have the textual hook of an unforgiving interpretation of the word "unable." But "[i]t is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health." *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 628 (D.N.J. 2001). The treatise definition of disability holds that "[t]he insured is considered to be permanently and totally disabled when it is impossible to work without hazarding his or her health or risking his or her life," 31 John Alan Appleman, *Appleman on Insurance* § 187.05[A], at 214 (2d ed. 2007), a proposition "sufficiently well-settled that in many jurisdictions it travels under the name of the 'common care and prudence rule,'" *Lasser*, 146 F.Supp.2d at 628. *Accord Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974); 46 C.J.S. *Insurance* § 1551, at 445 (2007); 44 Am. Jur. 2d *Insurance* § 1470, at 722 (2003).

This is only good sense. Some back conditions leave a patient literally able to lift heavy objects, but at risk of partial paralysis upon doing so; we would not deny disability benefits to a laborer with such a condition. And when busy professionals with cardiac troubles have brought ERISA suits because workplace stress caused a risk of heart

attack, they have typically prevailed. *See, e.g., Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003); *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001). It would not be impossible for an ERISA administrator to buck this legal tradition. But doing so should require what is manifestly absent here — some basis in the text of the plan.

The majority's response to this final problem gets to what may be the crux of its position. "[T]he risk of a heart attack is different from the risk of relapse into drug use," the majority explains. *Ante* at 6. Whether an addict "succumbs to [ ] temptation remains his choice; the heart-attack prone doctor has no such choice" because his condition is "physical." *Id.* at 7. In one sense, this passage is very welcome, for it would appear to limit an otherwise sweeping exclusion of medical conditions that cause "potential risk" to a more narrow exclusion of addictive relapse alone. In another sense, however, this passage is the most legally ungrounded yet, for it appears to rest on moral considerations of choice and temptation on the one hand, and medical considerations of physical inability on the other, neither of which are to be found in the language of a Plan that puts addiction squarely on all fours with other impairments.[1] The moral and medical choices are not this court's to make. They belong to those who bargained for the Plan — and who have something at stake in it.

## II.

The majority presents Continental's claim as an abstract one about the scope of the Plan's coverage, and thus never contends with the

---

[1] It is true that some lower courts have taken the majority's view, but others have not, and no appellate court has yet addressed the issue. *Compare Hellman v. Union Cent. Life Ins. Co.*, 175 F. Supp. 2d 1044 (M.D. Tenn. 2001) (holding that a recovering, substance-addicted anesthesiologist's risk of relapse may render him unable to return to his profession, depending on the facts), *and Brosnan v. Provident Life & Accident Ins. Co.*, 31 F. Supp. 2d 460 (E.D. Pa. 1998) (same), *with Allen v. Minn. Life Ins. Co.*, 216 F. Supp. 2d 1377 (N.D. Ga. 2001) (holding that a recovering, substance-addicted anesthesiologist's risk of relapse does not render him unable to return to his profession), *and Laucks v. Provident Cos.*, No. 1CV971507, 1999 WL 33320463 (M.D. Pa. Oct. 29, 1999) (same).

facts. As the majority puts it, Continental "did not dispute the medical judgment" that returning to work put Stanford at risk of relapse, but rather made a "contractual, not medical" determination that "risk of relapse did not fall within the benefit plan's definition of 'disability.'" *Ante* at 10. Since I do not think risk of addictive relapse and other medical risk can categorically be excluded from coverage, the proper inquiry in my view is fact-intensive and focuses on a risk's likelihood and gravity — as one might expect from a definition of disability that turns on an impairment's "degree of severity." *See Lasser*, 344 F.3d at 391 n.12 ("[W]hether risk of future effects creates a present disability depends on the probability of the future risk's occurrence."). It thus remains to scrutinize Stanford's evidence and see if he can carry his burden of demonstrating such risk. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270 (4th Cir. 2002) (noting that claimants bear the burden of proving disability).

Stanford has relapsed twice before. The first time was around October 2003, about a week after finishing his first treatment program and before he returned to work. After then enrolling in a more intense, ninety-day treatment program and returning to work (for the first time in almost six months), he promptly relapsed again. By May, he was in a third treatment program, which released him with a note from the treatment team stating that he should return to work only "with the restriction of not having access to narcotics." Through the rest of 2004, he never returned to work, and stayed clean.

Every medical opinion in the record indicates that Stanford should not return to his job as an anesthesia nurse due to his risk of addictive relapse. First is the already-mentioned note from his third treatment team. Continental also asked Stanford's treating physician, Dr. David Faulk, his opinion on the matter in a written "functional assessment" in August 2004. Asked to list "*specific impairments* in [Stanford's] ability to function" (emphasis in original), Dr. Faulk wrote: "Pt cannot be around narcotics." In December, Continental called with the same question, and Dr. Faulk repeated his concerns about Stanford's potential for relapse.[2] Finally, in January, Dr. Faulk wrote Continental a let-

---

[2]The majority states that in December 2004, Dr. Faulk told Continental "that Stanford no longer suffered any impairment that would prevent him

ter stating that Stanford is "unable to return to his regular duties as an anesthesia nurse. He cannot be subjected to controlled substances at this time."

The record also contains an article, which Stanford submitted to Continental in the course of his administrative appeal, about the apparently common problem of anesthesiologists becoming addicted to the drugs they administer. *See* Eric. B. Hedberg, *Anesthesiologists: Addicted to the Drugs They Administer*, ASA Newsletter (Am. Soc'y of Anesthesiologists, Park Ridge, Ill.), May 2001. The article, authored by a medical director of an addiction treatment facility, states that only about half of opiate-addicted anesthesia personnel can return to their profession even after substantial treatment. It also contains a list of seven factors, any one of which indicates that an addicted anesthesia specialist should "[n]ever return to clinical anesthesiology." Stanford underlines three of them: "Significant relapse despite adequate treatment," "Lacks confidence to return to the operating room and not self-administer anesthetic drugs," and "Significant Axis I or II psychopathology," such as Stanford's ongoing depression.

Finally, the narcotic to which Stanford became addicted, fentanyl, is a fearsome drug, which used properly has "an analgesic potency of about 80 times that of morphine" and used recreationally has "biological effects . . . indistinguishable from those of heroin" but potentially "hundreds of times more potent." Drug Enforcement Admin., U.S. Dep't of Justice, *Drugs of Abuse* 25-26 (2005). Illicit use began among medical personnel. *Id.* Indeed, the federal courts have seen a number of disability disputes featuring an anesthesia specialist addicted to the drug. *See, e.g.*, *Shafer v. Preston Mem'l Hosp. Corp.*, 107 F.3d 274 (4th Cir. 1997); *Allen v. Minn. Life Ins. Co.*, 216 F. Supp. 2d 1377 (N.D. Ga. 2001); *Laucks v. Provident Cos.*, No. 1CV971507, 1999 WL 33320463 (M.D. Pa. Oct. 29, 1999); *Holzer v. MBL Life Assurance Corp.*, No. 97 Civ. 5834(TPG), 1999 WL

---

from performing the duties of his occupation as a nurse anesthetist." *Ante* at 3. This is baffling. The record contains the Continental investigator's notes from the conversation, which state: "[C]onfirmed that Dr is saying that clmt has no impairment that would prevent him from doing his occ except for the potential for relapse."

649004 (S.D.N.Y. Aug. 25, 1999); *Vedernikov v. W. Va. Univ.*, 55 F. Supp. 2d 518 (N.D.W. Va. 1999).

To balance out the scale, Continental offers only repeated references to Stanford's seven months of outpatient therapy and clean living prior to the benefits cutoff. As Stanford argues, this evidence standing alone is so scant as to violate ERISA regulations. *See, e.g.*, 29 C.F.R. § 2560.503-1(h)(3)(iii) (2007) ("[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional . . . ."). Continental is so persistently abstract, to judge from the record, because it has nothing else to work with. Where a claimant presents substantial evidence of disability and an administrator presents almost nothing in response, the appropriate outcome is an award of benefits.

## III.

My inquiry thus far has been an inquiry of law, for I think the moral opprobrium that underlies the special exclusion for drug addicts is not grounded in the language of the Plan or the evidence in this case. But if we do take up the moral issue, I believe my colleagues mistake the moral balance. Mr. Stanford is not currently taking drugs; he is trying to cease taking drugs. We should give people like him a chance to get back on their feet. To put him to the cruel choice of losing his disability benefits or returning to the environment that impelled his addiction is not right. Judge-made exceptions are often assumed to be humane, while law is thought to be a cold, hard thing. But equity here is a sword that strikes against the needy but unfavored. Law would be kinder.